■ THOMAS COLLINS, an Infant, by His Parent and Natural Guardian, JOAN COLLINS, et al., Respondents-Appellants, v NEW YORK HOSPITAL et al.,

Defendants, DAVID GERBER et al., Respondents, and MASSAPEQUA HOSPITAL, Appellant-Respondent.—Judgment, Supreme Court, Kings County, entered October 27, 1977, after trial to a jury, modified, on the law, to vacate the judgment in favor of plaintiffs-respondents against defendant-appellant Massapequa Hospital and to dismiss the complaint against that party, and otherwise to affirm, without costs and without disbursements. Suit was brought against the hospital and treating physicians for malpractice in respect of the treatment given a youngster who suffered from what appeared to be a kidney ailment. Specifically, it was claimed that the hospital had failed to administer to the child a certain cystourethrographic test ordered by the defendants urologists. The jury exculpated the doctors, finding no cause against them, but brought in a verdict against the hospital. This apparent inconsistency would not have mandated reversal. However, the doctors had ordered the patient discharged from the hospital without waiting for the test in a matter of days following their order, thus *sub silentio* revoking the order for the test, and thereby diminishing its importance as a factor in diagnosis and treatment of the child's condition. Indeed, there was expert testimony that the condition of the patient was congenital and of a type which did not become the subject of medical literature until several years after the hospital treatment. The child's condition had actually improved, following antibiotic dosage, during the few days after the test was ordered, and the hospital to which he went after discharge delayed the test a few days further. The patient's illness had existed virtually from birth. During this time, he had been attended by several doctors other than defendants urologists, and none of them had been able to achieve a diagnosis leading to curative treatment. The evidence at trial indicated that, in any event, great difficulty would be encountered in the test's administration, a requirement of which was that the patient void while it is ongoing: a child is not ordinarily capable of performing this function on command. There was no evidence that the order for the test was deliberately violated. A special question was put to the jury as to whether it was malpractice and proximately causative of the child's condition for the doctors to have failed to diagnose his true condition before his discharge; it was answered in the negative. This squares with the jury's verdict in favor of defendants urologists. As the dissent states, "the record does contain evidence upon which the jury could find * * * the defendants urologists were liable in malpractice for permitting the infant's discharge with knowledge that the voiding cystogram had not been performed". The jury did, however, find to the contrary. Thus, says the verdict, the doctors did not commit malpractice by abandoning the test and discharging the patient without it. What was the hospital's responsibility? On the one hand, it could not order the test on its own; only doctors could do so. The hospital could not contravene the doctors' discharge order and *sua sponte,* keep the child in to perform the test. It was not shown that the brief period after the order was given during which the test was not performed, some 11 days, contributed to a worsened condition, or indeed that the condition was really worsened at all. The quoted testimony of Dr. Luchs set out in the dissent states merely that the diagnosis of the child's congenital ailment would have come earlier, and then, guardedly, without certainty: "I don't know where your lines would be drawn, but the damage is progressive, and the damage would not have progressed to that degree; perhaps it would have been slightly less, a lot less; that is difficult to say". Even though at one point he stated categorically his opinion that a worsened condition resulted from failure to give the test, he actually never did say that anything significant did happen or could have happened by

reason of the 11-day delay between the order for the test and the child's discharge. It is difficult, if not impossible to account for the jury's apparently inconsistent verdict unless it be by reason of the court's having charged at one point as to the necessity for proof of causal connection and at another point completely omitting to charge on the necessary causal link, and instructing only that the hospital is "obliged to follow a doctor's orders and if * * * the hospital failed to carry out the doctor's orders, then * * * you may find the hospital negligent." While, viewed in its totality the charge was technically sufficient in instructing as to the necessity for evidence of causal connection, the omission so to charge at one point could easily have been confusing to the point of bringing about the verdicts claimed to have been inconsistent. On this record, malpractice was not found as to the urologists, and cannot be found as against the hospital. The verdict in favor of the urologists should stand; that against the hospital cannot properly be inferred from the evidence, and it should be reversed and the complaint dismissed. It must be noted that the dissent also calls for reversal, but *in toto,* and a remand for a new trial, even as against Doctors Gerber and Qualliotine. The former was an osteopath who had attended the child in an earlier stage; he was exculpated by the jury. The latter was completely out of the case by reason of settlement. Nor was the result actually inconsistent as a matter of law, for one verdict was not dependent on the other. The hospital's liability is completely separate and apart from that of the urologists. This is not a case of derivative liability; a finding of malpractice on the part of the hospital for failure to follow a medical order does not derive necessarily from malpractice by the doctors. Thus, two of the cases cited in the dissent, *Agoado v Cohen* (234 App Div 37), and *Goines v Pennsylvania R. R. Co.* (3 AD2d 307, rearg den 4 AD2d 831), each resting on derivative liability by reason of *respondeat superior,* have no application here. Nor does *Bessey v Driscoll* (202 App Div 817), decided solely on a finding that counsel had consented to a full retrial based on inconsistency. Our holding in this case for reversal as to the hospital alone is based solely on the lack of a case of liability on the evidence before us. Concur—Lupiano, Markewich and Sullivan, JJ.

Murphy, P. J., and Evans, J., dissent in a memorandum by Murphy, P. J., as follows: I agree with the majority that the charge was technically sufficient. However, I disagree with them in three particular areas. First of all, it is somewhat misleading to state that the infant plaintiff's condition improved while he was in Massapequa Hospital. It may be true that on the date of his discharge, July 19, 1969, his temperature was lower and his kidney function was greater than on the date of his admission, July 6, 1969. However, as is now known, these so-called improvements were not actual improvements at all. Through the use of antibiotics and other medical treatments, the doctors had temporarily stabilized the side effects of his congenital kidney disease. Within a week after his discharge, the infant was again experiencing severe pains, recurring fevers, vomiting and other symptoms associated with his urinary condition. Secondly, the record does contain evidence upon which the jury could find that (1) the defendant urologists were liable in malpractice for permitting the infant's discharge with knowledge that a voiding cystogram had not been performed; and (2) defendant Massapequa Hospital was liable in malpractice in failing to perform that test before the infant's discharge. Dr. Luchs, one of the plaintiffs' *medical* experts, testified as to the effects of the defendants urologists' failure to perform the subject test: "BY MR. TURKEWITZ: Q. Doctor, do you have an opinion as to whether the urologist acted as the average,

prudent urologist in the community would have acted at that time in discharging this child, without diagnosing the underlying cause of the reflux and the hydronephrosis, and operating on him? MR. FRIEDMAN: Objection, asked and answered. THE COURT: No, overruled. A. I would say that he acted in a manner not usual, in not getting the voiding cystourethrogram, which would have made the diagnosis. Following the diagnosis, then an operation would have been indicated. Q. In your opinion, did the delay of the surgery contribute to the further destruction of these kidneys? MR. FRIEDMAN: Objection, your Honor. THE COURT: Overruled. MR. FRIEDMAN: He hasn't testified there was any further obstruction, nor has he any basis for testifying as of yet that he has told us about. THE COURT: Overruled. BY MR. TURKEWITZ: A. I would say that every time that this child voided, there was further damage caused to the kidneys because of this water hammer effect of the urine shooting back up to the kidneys." Later in his direct examination, Dr. Luchs also made the following evaluation: "BY MR. TURKEWITZ: A. Had the voiding cystourethrogram been performed, the diagnosis would have been immediately made. Q. And in your opinion, was that a competent producing cause of the increased kidney destruction? MR. FRIEDMAN: Objection. THE COURT: Overruled. A. The damage would not have been as severe. I don't know where your lines would be drawn, but the damage is progressive, and the damage would not have progressed to that degree; perhaps it would only have been slightly less, a lot less; that is difficult to say." With regard to Massapequa's failure to perform the test, Dr. Luchs testified as follows: "BY MR. TURKEWITZ: * * * Do you have an opinion which you can state with a reasonable degree of medical certainty as to whether it was a deviation from customary and usual procedures in the community for the hospital to have failed to carry out the order for the voiding cystogram? A. Yes. Q. What is your opinion? A. That especially in this case, the voiding cystourethrogram *was very definitely indicated and necessary in order to make a* proper diagnosis. Q. Was it a deviation for the hospital to have failed to have performed the voiding cystogram? A. If the doctor ordered it, yes * * * Q. Doctor, do you have an opinion which you can state with a reasonable degree of medical certainty as to whether the failure of the hospital to do the voiding cystogram delayed the ultimate diagnosis and treatment of this child? MR. FRIEDMAN: Objection. THE COURT: Overruled. A. It did." From the above-quoted excerpts, the jury could have concluded that (1) the defendants urologists were liable for discharging the infant before the test was performed and (2) defendant Massapequa was responsible for failing to perform the test according to the defendant Drabkin's order before the infant was discharged (*Toth v Community Hosp. at Glen Cove*, 22 NY2d 255, 264). Although the jury found that the urologists were not liable, the fact remains that there is sufficient evidence in the record pursuant to which they could have rationally determined that Massapequa Hospital was responsible for malpractice. (*Blum v Fresh Grown Preserve Corp.*, 292 NY 241, 245.) Consequently, the majority should *not, as a matter of law*, render a judgment in favor of defendant Massapequa based upon the insufficiency of plaintiffs' evidence. Likewise, it was for the jury to determine the amount of damage caused by Massapequa's failure to give the voiding cystogram, even if such damages be minimal in nature. The majority also emphasizes the fact that there was testimony suggesting that the infant's congenital condition did not become the subject of medical literature until several years after the treatment by these defendants. Even if it were assumed that the infant's condition was not the subject of medical literature in the time frame covered by this action, the defendants may still be held liable for

malpractice in failing to use their ordinary skills in discovering the condition. Within three weeks after the infant's discharge from defendant Massapequa, the physicians and technicians in New York Hospital were quickly able to pinpoint and treat that very same condition. Had the defendants used the care and diligence exercised by the treating physicians and technicians in New York Hospital, it is possible that the infant would not now be facing the imminent use of an artificial kidney. Thirdly, I agree with the majority that the jury's answers to Questions Nos. 3 and 4 were inconsistent. However, I disagree that this inconsistency may be overlooked. A verdict by the same jury in the same case making two contradictory decisions on the same issue is contrary to law and must be set aside *(Bessey v Driscoll,* 202 App Div 817). Normally, an inconsistent verdict will directly involve all parties to a proceeding. For example, where a verdict is inconsistent as between a defendant employer and a defendant employee, a new trial is ordered as to both those defendants. *(Goines v Pennsylvania R. R. Co.,* 3 AD2d 307, rearg den 4 AD2d 831; *Agoado v Cohen,* 234 App Div 37.) The present case presents a somewhat unusual situation. The verdict, as against defendant Massapequa and the defendants urologists, is inconsistent. The verdict, on its face, is not inconsistent with regard to the negative answers given by the jury to Questions Nos. 1 and 2 concerning the malpractice of defendants Qualliotine and Gerber. The more narrow issue presented is whether the inconsistency on the third and fourth questions so tainted the entire verdict as to warrant a new trial with regard to all the parties. The Court of Appeals has aptly observed *(Gray v Brooklyn Hgts. R. R. Co.,* 175 NY 448, 450): "When, however, the two actions are thus tried together and inconsistent verdicts are rendered, we incline to the view that sound practice requires both verdicts to be set aside at once, without attempting by analysis of the evidence, or otherwise, to discover whether either should be allowed to stand. No other course is safe, for it cannot be told with reasonable certainty what facts the jury found." In this proceeding, the jury acted inconsistently, illogically and irrationally in answering Questions Nos. 3 and 4. In that background, it is fair to infer that the jury also acted irrationally in evaluating the evidence adduced against defendants Qualliotine and Gerber under Questions Nos. 1 and 2. At the very least, grave doubt is cast upon the soundness of the thought processes exercised by the jury. The interest of justice requires a new trial as to all defendants, including defendants Qualliotine and Gerber, because the entire verdict has become suspect. A closing comment must be made with regard to defendants Qualliotine and Gerber. Although Qualliotine settled prior to the verdict, counsel for the parties agreed that the issue of his liability should still be submitted to the jury for apportionment purposes. For that reason, he should be joined as a party defendant at the new trial. The parties charted their course in the original trial and the new trial should reflect that same procedural course unless the parties agree otherwise. A new trial should be ordered as to Gerber for there was evidence in the record that over a period of three years he failed to order a urinary workup for the infant despite clear signs and symptoms associated with urinary distress. For the foregoing reasons, I would reverse the judgment of the Supreme Court, Kings County, entered October 27, 1977, on the law, and I would order a new trial as to all parties.