GUSS HARDEMAN, Respondent, v MENDON LEASING CORP., Appellant, et al., Defendants.

First Department, June 3, 1982

#### APPEARANCES OF COUNSEL

*Harry Organek* of counsel (*Howard S. Davis,* attorney), for appellant.

*Norman Bard* of counsel (*Sandra Krevitsky* with him on the brief; *Mangiatordi & Corpina, P. C.,* attorneys), for respondent.

#### OPINION OF THE COURT

SULLIVAN, J.

On August 16, 1977, at about 7:45 P.M., plaintiff Hardeman was standing on a concrete island in the center of the intersection of the Bowery and East Houston Street in

Manhattan when a van, rented by Midtown Paint Company from Mendon Leasing Corporation and driven by Midtown's employee, Joseph Schneider, mounted the island and struck a light pole, which fell and injured Hardeman. Schneider fled the scene of the accident and abandoned the van, which was found a few blocks away.

Hardeman was taken unconscious to the hospital where an emergency tracheotomy. and thoracotomy were performed. He remained comatose for six days. His injuries included a concussion, skull contusion, and fractured rib, as well as multiple nose and facial fractures. Hardeman underwent corrective surgery two weeks after admission and was·discharged two weeks thereafter. Six to eight weeks after his release, he returned to the hospital to have wires removed from his mouth. No further treatment was required. At the time of the accident Hardeman was unemployed and had been living on the Bowery.

At the trial of Hardeman's personal injury action, the court charged the jury that Schneider was liable as a matter of law. Not only did the evidence dictate such a finding, but both Mendon and Midtown Paint had conceded in the course of the trial that Schneider, who defaulted in appearing, had been negligent. Both defendants, however, sought to absolve themselves by claiming that Schneider's use of the van was unauthorized. Thus, the issue of permissive use was submitted to the jury as being determinative of the question of their vicarious liability under section 388 of the Vehicle and Traffic Law.[1] The jury returned a verdict in favor of Hardeman in the sum of $425,000 against both Mendon and Schneider, but exonerated Midtown Paint. Mendon was granted judgment against Schneider on its cross claim for indemnification. Mendon has appealed, arguing, *inter alia,* that the verdict against it and in favor of Midtown Paint is inconsistent and repugnant since the finding, implicit in the verdict, that the van was not being used with the consent of Midtown Paint or in the course of its business conclusively established that Schneider stole the van through the fraudulent misrepresentation that

---

1. As a lessee under a lease for a period greater than 30 days Midtown Paint, pursuant to section 128 of the Vehicle and Traffic Law, is an owner within the contemplation of section 388.

Midtown had authorized him to take it to make a night delivery. In such circumstances, Mendon argues, since it was equally victimized by the fraud, it could not have consented to the use of the van. Appealing as this argument may appear, it lacks merit. Equally unavailing is Mendon's alternative argument that, even putting the issue of repugnancy aside, the evidence, as a matter of law, cannot support a finding that it consented to Schneider's use of the van.

The evidence on this issue is not in dispute. Mendon, which is in the truck leasing business, maintains a facility at 18th Street and 10th Avenue for the garaging and servicing of its vehicles. Midtown Paint is one of its customers. On the night of the accident and for some time prior it leased a 1974 GMC van which it used for deliveries. Pursuant to custom and practice and in accordance with the terms of the lease, the van was returned each evening to the Mendon garage usually at 4:30 P.M., for safekeeping, refueling and servicing. The keys would be left in the van. Mendon parked approximately 80 other vehicles under similar arrangements on the second floor of this particular garage.

Mendon employed an around-the-clock staff of garagemen, one of whom, Wade Martin, regularly worked the 1:00 P.M. to 9:30 P.M. shift. Martin's assignment included parking the vehicles as they were returned, and servicing them as needed. Martin was also authorized to release vehicles to the authorized drivers of the respective lessees. In accordance with its lease Midtown Paint was required to file a list of its authorized drivers with Mendon, "[t]he furnishing of [which] shall constitute full authority * * * to investigate the driving record of each individual and to give possession of a vehicle to any person named thereon." No such list was ever furnished.

About a month before the accident Midtown Paint had hired Schneider as a store clerk and substitute driver. Although, in fact, Schneider never held a valid license, Irving Ganz, Midtown's principal, testified that at his request Schneider had shown him a driver's license at the time he was hired. Ganz recalled telephoning Mendon a few days later to authorize Schneider's use of the van.

At about 7:00 P.M. on the night of the accident Mendon's garageman, Martin, received a telephone call from someone who identified himself as the "boss" at Midtown Paint. Martin could not recall the name of the caller, who stated that he was sending his driver over to pick up the van. When Martin asked when Midtown had started making night deliveries, the caller told him that it was a "special occasion". Nor could Martin recall Midtown ever making a similar request. About a half hour later Schneider walked into the garage. Based on the earlier telephone call and his familiarity with Schneider, whom he had seen returning the Midtown van on two or three earlier occasions, Martin allowed Schneider to take the vehicle.

Schneider failed to report for work the next morning and was arrested later that day and charged with leaving the scene of an accident and unlicensed operation. On the following day Mendon filed a criminal complaint charging him with grand larceny. In a written statement to the police Schneider insisted that at the time of the accident he was operating the van with Midtown's permission for the purpose of making an emergency delivery to a contractor in Brooklyn. Ganz, however, testified that he had last seen Schneider on the day of the accident at about 5:00 P.M., when Schneider left for the day. Ganz had closed the Midtown door that day at the usual time, 6:00 P.M. Ganz also testified that not once in Midtown's 35-year existence had it ever used the van for an emergency or night delivery. About a month after his arrest Schneider pleaded guilty in Criminal Court to attempted unauthorized use of a motor vehicle and leaving the scene of an accident.

At the outset, we note that this is not a situation of derivative liability where the defendants stand or fall together. (Cf. *Pangburn v Buick Motor Co.*, 211 NY 228; *Gamell v Mount Sinai Hosp.*, 34 AD2d 981; *Agoado v Cohen*, 234 App Div 37.) The evidence clearly shows that Midtown did not have any knowledge of Schneider's actions with respect to the taking of the van on the evening of the accident, and that it did not consent to its use. Indeed, Ganz testified without contradiction that in the 35 years that Midtown Paint had been in business it had never used

the van for emergency or night deliveries. Employees were never permitted to drive it for their own use; none of them, not even Ganz, had a key to the van. Thus, on the basis of this testimony, the jury could properly find that Midtown Paint was a victim, albeit unwitting, of Schneider's fraud, and that it never consented, expressly or impliedly, to Schneider's use of the van on the evening in question.

Mendon's liability, on the other hand, turned on a consideration of an entirely different set of facts. While duped by the same fraud, it had the opportunity to verify the representation, both at the time of the telephone call and when Schneider appeared at the garage. Its garageman, Martin, acknowledged that the van was never used during evening hours. Prior to the night of the accident, Midtown Paint had never made an emergency request for the van. Nor could Martin recall ever releasing the van at night before. Nevertheless, on this occasion he allowed Schneider to take the vehicle without any inquiry because he had "seen the guy once or twice". According to Martin, the determination whether to release a vehicle turned solely on "[his] best judgment." Thus, the decision to release the van to Schneider was based on facts known to Mendon alone, and on its own assessment of the request. Consequently, circumstances which may have constituted an unauthorized taking as far as Midtown was concerned might be viewed differently when measured against Mendon's role in the transaction, and a jury could find that Mendon's liability was separate and distinct from Midtown's. (Cf. *Collins v New York Hosp.*, 67 AD2d 872, 873, mod on other grounds 49 NY2d 965.)

The principle is well established that "[t]he owner of an automobile may restrict its use to a specified purpose, and, when the operator is engaged in pursuing some other end, the use must be deemed to be without the owner's consent". (*Harper v Parker,* 12 AD2d 327, 330; see, also, *Arcara v Moresse,* 258 NY 211; *De Lancey v Nationwide Ins. Co.,* 26 AD2d 631, affd 20 NY2d 807.) Public policy considerations, however, necessarily play a significant role in any assessment of whether an owner has consented to the use of his motor vehicle. For that reason, section 388 of the Vehicle

and Traffic Law,[2] which imputes to the owner of a motor vehicle the negligence of one who uses or operates it with his permission, has been liberally interpreted to expand an owner's derivative liability. (*MVAIC v Continental Nat. Amer. Group Co.,* 35 NY2d 260, 264; cf. *Cooperman v Ferrentino,* 37 AD2d 474, 478.) "[This statute] expresses the policy that one injured by the negligent operation of a motor vehicle should have recourse to a financially responsible defendant. The owner of the automobile is the obvious candidate, for he can most easily carry insurance to cover the risk." (*Continental Auto Lease Corp. v Campbell,* 19 NY2d 350, 352.) Thus, because of the nature of the car rental business, courts look unfavorably upon provisions in rental agreements restricting the use to which the vehicle may be put, since any deviation would vitiate the lessor's consent and leave an injured victim without adequate protection. (*MVAIC v Continental Nat. Amer. Group Co.,* 35 NY2d, at p 264; *Allstate Ins. Co. v Dailey,* 47 AD2d 375, affd 39 NY2d 759.) For example, in *MVAIC v Continental Nat. Amer. Group Co. (supra)* the lease agreement contained a clause which prohibited operation of the vehicle by a person other than the lessee or an adult member of his immediate family unless consent was first obtained from the lessor. The lessee, without such consent, authorized another person to drive the vehicle in the course of which the vehicle was involved in an accident, causing injury to a passenger who thereafter brought an action against the operator and the lessor. The lessor's insurer refused to defend or indemnify the driver on the ground that he was an unauthorized operator under the lease agreement. In rejecting this argument and finding constructive consent, the Court of Appeals noted (pp 263-264):

"Daily, car rental agencies rent large numbers of vehicles to the general public for profit. They are not in the same position as the private car owner who loans his car to a friend or relative for a limited purpose * * * and, unlike

---

**2.** Section 388 of the Vehicle and Traffic Law, in pertinent part, provides: "1. Every owner of a vehicle used or operated in this state shall be liable and responsible for death or injuries to person or property resulting from negligence in the use or operation of such vehicle, in the business of such owner or otherwise, by any person using or operating the same with the permission, express or implied, of such owner."

the short span of a friendly individual loan, restrictions in rental agreements affect the use of a large number of vehicles, these arrangements sometimes continuing over long periods of time.

"The restrictions sought to be imposed by [the insurer] violate the public policy of this State. A slight deviation from such a restrictive lease could render an injured victim devoid of adequate protection, which is contrary to the legislative intent envisaged by section 388 of the Vehicle and Traffic Law."

Of course, as Mendon properly notes, even considerations of public policy are not without their limitations. An innocent victim of an accident may not recover from a lessor or other owner where the offending vehicle was operated without the owner's permission. (See *Payne v Payne*, 28 NY2d 399; *Aetna Ins. Co. v Johnson*, 84 AD2d 505; *Speller v Ryder Truck Rental*, 47 AD2d 608.) Clearly, if it were otherwise, an owner's derivative liability would be absolute, a result which, notwithstanding the strong presumption of intent embodied in section 388 of the Vehicle and Traffic Law, is clearly not contemplated by the statute, and which, in any event, would raise serious constitutional questions. In our view, however, the jury's determination that Mendon consented to Schneider's use of the vehicle finds ample support in the record.

*Allstate Ins. Co. v Dailey* (47 AD2d 375, *supra*) is in point. A third party was injured, allegedly as a result of negligence in the operation of a rented vehicle driven by an individual who had fraudulently obtained the vehicle from the rental agency by producing a forged license and credit card. The lessor argued that the vehicle had been obtained by outright theft since it could not have given its consent where the driver's fraud had induced it to lease the vehicle. The court rejected this analysis (p 377), and opted instead "to follow * * * the broad intent of our public policy and the sweep of the rule in the [*MVAIC v Continental Nat. Amer. Group Co.,* 35 NY2d 260, *supra*] case in determining the effect of the transaction between [the lessor] and [driver] vis-à-vis [the injured party]."

The rationale for the court's conclusion was as follows:

"The case is similar in many respects to those in which an imposter obtains credit by impersonating another. 'Where the vendor of personal property intends to sell his goods to the person with whom he deals, then title passes, even though he be deceived as to that person's identity or responsibility' * * * In such an event, an innocent purchaser would acquire good title from the imposter as against the party deceived, even though a thief could not convey good title to an innocent purchaser. In the same sense, and for the reasons reflected by our statute, the innocent third party injured by the negligence of the imposter should be protected by the financial responsibility of the owner who leased the automobile to the imposter * * *

"Here we think that [the lessor's] carrier must bear the responsibility for any injury suffered by [the third party], for [the lessor] put the automobile into the traffic stream, and had at its disposal the opportunity to check the means by which the automobile was leased." (*Allstate Ins. Co. v Dailey, supra,* at p 378.)

Mendon attempts to distinguish *Dailey* (*supra*) in that, here, the fraud did not relate to a mere incident of the lease transaction, such as driver identity, but to a material aspect of its decision to release the van to Schneider, viz., his intended use of the vehicle and concomitant authority. Citing the court's observation in *Dailey* (*supra,* p 377) that "[the lessor] was not deceived as to [the driver's] intended use, but rather as to [the driver's] identity", Mendon argues that due process would be offended if the public policy considerations which underlie section 388 of the Vehicle and Traffic Law were applied here. We cannot agree. The same public policy considerations should control. Mendon was in a position to verify whether the emergency request was authorized and, if not satisfied, to refuse release of the van. Instead, contrary to a well-established custom and practice, it gave the vehicle to Schneider at an hour well past the close of the business day. Apparently, the decisive factor in the decision to release the vehicle was the attendant's familiarity with the driver. Martin was satisfied because he had seen Schneider with the van on one or two earlier occasions. In such circumstances, as between Hardeman, the injured party, and Mendon, Mendon's conduct

in permitting Schneider to take the vehicle, albeit under the mistaken belief that Schneider was engaged in the business of Midtown, is a sufficient basis upon which to subject it to liability. (See *Allstate Ins. Co. v Dailey,* 47 AD2d, at p 378; see, also, *Lorippo v Chrysler Leasing Corp.,* 59 Misc 2d 534.)[3]

■ We have examined Mendon's other contentions and find that they are without merit, except that we agree that the award of $425,000 was grossly disproportionate to Hardeman's actual damages and find the award excessive to the extent that it exceeded $275,000.

Accordingly, the judgment, Supreme Court, New York County (AMANN, J.), entered on June 5, 1981 in favor of plaintiff in the sum of $425,000, should be modified, on the law and on the facts, to the extent of reversing the judgment in favor of plaintiff and ordering a new trial on the issue of damages only, without costs or disbursements, unless plaintiff, within 20 days after service of a copy of the order to be entered herein, with notice of entry, serves and files in the office of the clerk of the trial court, a written stipulation consenting to reduce the verdict in his favor to $275,000 and to the entry of an amended judgment in accordance therewith. If plaintiff so stipulates, the judgment, as so amended and reduced, is affirmed, without costs or disbursements.

KUPFERMAN, J. P., MARKEWICH, FEIN and ASCH, JJ., concur.

Judgment, Supreme Court, New York County, entered on June 5, 1981, unanimously modified, on the law, and on the facts, to the extent of reversing the judgment in favor of plaintiff and ordering a new trial on the issue of damages only, without costs and without disbursements, unless plaintiff, within 20 days after service of a copy of this court's order, with notice of entry, serves and files in the office of the clerk of the trial court, a written stipulation consenting to reduce the verdict in his favor to $275,000 and to the entry of an amended judgment in accordance

---

3. Courts in other jurisdictions, applying public policy considerations, have reached the same conclusion. (See *Tuderios v Hertz Drivurself Stas.,* 70 Cal App 2d 192; *Bridgeford v U-Haul Co.,* 195 Neb 308; *Fischer v Market Ford Sales,* 302 Minn 301.)

therewith. If plaintiff so stipulates, the judgment, as so amended and reduced, is affirmed, without costs and without disbursements.