**Thomas P. VERRI, Plaintiff,**

v.

**Frank NANNA, Individually and as Chief of Police of the Village of Elmsford, John Caralyus, Individually, and The Village of Elmsford, New York, Defendants.**

**No. 95 Civ. 3163(WCC).**

United States District Court, S.D. New York.

Aug. 1, 1997.

Lovett & Gould, White Plains, NY (Craig T. Dickinson, of counsel), for Plaintiff.

Lieberman & LeBovit, Yorktown Heights, NY (Mitchell P. Lieberman, of counsel), for Defendant Frank Nanna.

## OPINION AND ORDER

WILLIAM C. CONNER, Senior District Judge.

This action is the first of three successive civil rights suits that plaintiff Thomas Verri, an Elmsford Police Officer, has brought against, *inter alia*, defendant Frank Nanna, Chief of Police of the Village of Elmsford, and the Village of Elmsford. Plaintiff originally brought fourteen separate claims, under 42 U.S.C. § 1983, the New York Civil Rights law and the New York Constitution, but he has since abandoned his second, third and eighth claims.[1] Defendants have moved for summary judgment on all the remaining claims. For the reasons set forth below, their motion is granted.

## BACKGROUND

Plaintiff has worked for the Elmsford Police Department since 1990. Defendant Nanna, a twenty-seven year veteran of the Elmsford Police Department, has been Chief since 1990. In approximately January of 1993, Verri began keeping a "personal diary/journal" in which he made roughly 17 separate entries. (Compl. ¶ 7; Exh. 2.) In his complaint he alleged that his "then estranged wife who was acting in concert with Nanna" delivered the diary to Nanna. (Compl. ¶ 8.) Plaintiff later testified, however, that he had "reason to believe now" that his ex-business partner, Dominick Colasuonno, gave the book to Lt. Rescigno, who gave it to Chief Nanna. (Verri Trans. at 220.) Lt. Rescigno and Dominick Colasuonno testified that Colasuonno gave Rescigno the book in February of

1995, (Rescigno Aff. ¶ 2; Colasuonno Aff. ¶ 2); Chief Nanna and Lt. Rescigno testified that Rescigno gave Nanna the book shortly thereafter. (Nanna Aff. ¶ 4; Rescigno Aff. ¶ 2). Plaintiff last recalls seeing the book in September of 1994 and argues that Chief Nanna had possession of it earlier than February of 1995. (Verri Trans. at 123.) After receiving the book, Nanna met with Verri and told him he had the book. However, he refused to return it immediately. (Nanna Aff. ¶ 5.) In explanation of the delay, Nanna states that he was concerned about Verri's "emotional problems," including his dislike of the supervisors in the department and his general unhappiness. Nanna testified that he was particularly concerned because as a police officer, Verri carried a weapon, and that he consequently gave the book to the police psychiatrist, Dr. Aryeh Klar, for evaluation. (*Id.*; Klar Aff. ¶ 6.) After plaintiff filed suit in May of 1995, Nanna turned the book over to his attorney, who returned it to Verri.

Verri's first and seventh claims allege that Nanna's possession of his personal diary and refusal to return it to him violated his Fourteenth Amendment and New York State due process rights. His fourth and ninth claims allege that Nanna retaliated against him because of the content of his diary in violation of the First Amendment and the New York State Constitution. He accuses Nanna of retaliating against him, both directly and indirectly, in various ways including allegedly: 1) requiring him to submit to a breathalyzer test after he was involved in an automobile accident while driving a police vehicle[2]; 2) "repeatedly" ordering him to submit to drug testing; 3) following him and issuing false deficiency notices and; 4) skipping him for promotion. Verri's fourteenth claim alleges

---

1. Although Verri's second claim initially alleged that Nanna's "reading, dissemination and retention" of Verri's diary violated his right to privacy as guaranteed him by reason of the Fourteenth Amendment, he has subsequently dropped this claim. (*See* 6/13/97 Ltr. to this Court from Craig Dickinson, attorney for plaintiff, at 3.) In addition, claims three and eight, alleging an agreement to "falsely accuse Plaintiff of criminal wrongdoing" in violation of his rights of free

speech under the First Amendment and the New York State Constitution, have been dropped by stipulation. (*See* 6/12/97 Stipulation of Discontinuance and Dismissal.)

2. Verri's fourth and ninth claims allege that the administration of the breathalyzer test allegedly violated his Fourth Amendment right to be free from unreasonable searches and seizures as well.

that Nanna and the Village placed deficiency notices in his file in violation of his right to free speech under the First Amendment and the New York State Constitution, and his right to due process under Section 5711–q of the Unconsolidated Laws of New York. Verri's fifth, sixth, and tenth through twelfth claims allege that the Elmsford police department has several policies limiting communications by police officers with the Village Legislative Board that violate the First Amendment, the New York Constitution and § 15 of the New York State Civil Rights Law.

Defendants have moved for summary judgment on all counts, asserting: first, that Verri's federal constitutional rights were not violated; second, that, in the alternative, Chief Nanna is entitled to qualified immunity; and third, that the Village of Elmsford is not liable because the actions Verri complains of were not the result of a policy or practice of Elmsford. Although defendants request that this Court dismiss or grant summary judgment against *all* of plaintiff's claims, their motion addresses only Verri's *federal constitutional* claims. Apparently, they hope to win summary judgment on all of the federal claims and thus eliminate the basis for supplemental jurisdiction over Verri's state claims. We discuss defendants' challenge to Verri's federal constitutional claims below.

## DISCUSSION

I. *Summary Judgment Standard and the Qualified Immunity Defense*

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(c). A material fact is genuinely disputed only if, based on that fact, a reasonable jury could find in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). On a motion for summary judgment, all evidence must be viewed and all inferences must be drawn in the light most favorable to the nonmoving party. *City of Yonk-*

*ers v. Otis Elevator Co.*, 844 F.2d 42, 45 (2d Cir.1988).

The party seeking summary judgment bears the initial burden of "informing the district court of the basis for its motion" and identifying the matter "it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Upon the movant's satisfying that burden, the onus then shifts to the non-moving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250, 106 S.Ct. at 2511. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986), "but must set forth specific facts showing that there is a genuine issue of fact for trial." *First Nat'l Bank of Az. v. Cities Serv. Co.*, 391 U.S. 253, 288, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569 (1968). Summary judgment is usually unwarranted when the defendant's state of mind is at issue. *Clements v. Nassau County*, 835 F.2d 1000, 1005 (2d Cir.1987). In order to raise a fact issue regarding state of mind, however, there must be solid circumstantial evidence to prove plaintiff's case. *Id.* "Mere conclusory allegations, speculation or conjecture will not avail a party resisting summary judgment." *Cifarelli v. Village of Babylon*, 93 F.3d 47, 51 (2d Cir.1996).

In addition to satisfying the Rule 56 evidentiary standards, plaintiff must also overcome the defense of qualified immunity in order to defeat defendant Nanna's motion for summary judgment. Qualified immunity protects government officials from liability for damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Hurlman v. Rice*, 927 F.2d 74, 78 (2d Cir.1991). The Second Circuit has stated that when a defense of qualified immunity is raised in the context of a retaliatory claim, a court must decide first whether a clearly established right is at stake, and second, whether the

conduct was objectively reasonable. *Blue v. Koren,* 72 F.3d 1075, 1084 (2d Cir.1995). Conduct that is objectively reasonable does not constitute a constitutional violation merely upon the allegation of an unconstitutional motive. The Court elaborated that:

> [U]pon a motion for summary judgment asserting a qualified immunity defense in an action where an official's conduct is objectively reasonable but an unconstitutional subjective intent is alleged, the plaintiff must proffer particularized evidence of direct or circumstantial facts, supporting the claim of an improper motive in order to avoid summary judgment.... In our view, the particularized evidence of improper motive may include expressions by the officials involved regarding their state of mind, circumstances suggesting in a substantial fashion that the plaintiff has been singled out, or the highly unusual nature of the actions taken.

*Id.* (summary judgment granted where plaintiff made no allegations of particularized statements by state officials indicating a retaliatory motive).

## II. *Verri's First and Fourth Amendment Retaliation Claims*

 Verri's fourth claim alleges that Nanna improperly read his personal diary and retaliated against him in violation of the First and Fourth Amendments. "It is well established that a public employer cannot discharge or retaliate against an employee for the exercise of his or her First Amendment free speech right." *Ezekwo v. New York City Health and Hospitals Corp.,* 940 F.2d 775, 780 (2d Cir.), *cert. denied,* 502 U.S. 1013, 112 S.Ct. 657, 116 L.Ed.2d 749 (1991). However, "[i]t has also been recognized that the government has a legitimate interest in regulating the speech of its employees that differs significantly from its interests in regulating the speech of people in general." *Piesco v. City of New York, Dept. of Personnel,* 933 F.2d 1149, 1155 (2d Cir.), *cert. denied,* 502 U.S. 921, 112 S.Ct. 331, 116 L.Ed.2d 272 (1991). In *Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), the Supreme Court attempted to strike a balance between these competing interests in holding that "the scope of a public employee's First Amendment rights must be determined by balancing the public employee's rights as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Piesco,* 933 F.2d at 1155.

 To make out a prima facie case of retaliation in violation of the First Amendment, the employee must first establish that his speech can be "fairly characterized as a matter of public concern" and second "that the speech was at least a 'substantial' or 'motivating' factor" of the adverse action. *Frank v. Relin,* 1 F.3d 1317, 1328 (2d Cir.) (citations omitted), *cert. denied,* 510 U.S. 1012, 114 S.Ct. 604, 126 L.Ed.2d 569 (1993). The first element is a question of law, the second a question of fact. *Id.* If an employee does establish a prima facie case, a defendant can nonetheless avoid liability either by showing that it "would have made the same decision in the absence of the protected conduct," or "that the employee's conduct interfered with its effective and efficient fulfillment of its responsibilities to the public." *Id.* at 1329 (citations omitted); *see also Jeffries v. Harleston,* 52 F.3d 9, 13 (2d Cir. 1995), *cert. denied,* — U.S. ——, 116 S.Ct. 173, 133 L.Ed.2d 114 (1995) (defendant need not show speech actually interfered with workings of office, but only that it reasonably threatened to do so). Defendants have challenged Verri's prima facie case on both grounds. First, they argue that the entries in his diary do not raise a matter of public concern. Second, they contend that even if the entries are considered a matter of public concern, plaintiff has not produced evidence that the writings were a substantial or motivating factor in any adverse action taken against him sufficient to defeat a motion for summary judgment. We agree with both arguments.

### A. *Whether Verri's Diary Addressed Matters of Public Concern*

 The Supreme Court has held that "[w]hether an employee's speech addresses a matter of public concern must be determined

from the content, form, and context of a given statement, as revealed by the whole record." *Connick v. Myers*, 461 U.S. 138, 147–148, 103 S.Ct. 1684, 1690, 75 L.Ed.2d 708. (1983). It explained that "[w]hen a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters of only personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior." *Id.* at 147, 103 S.Ct. at 1690. As the Supreme Court explained in *Connick*, the Constitution does not "require a grant of immunity for employee grievances not afforded by the First Amendment to those who do not work for the state." *Connick*, 461 U.S. at 147–149, 103 S.Ct. at 1690. Thus, "a writing, not otherwise of public concern does not attain that status because its subject matter could, in different circumstances, have been the topic of a communication to the public that might be of general interest." *Id.* at 148, 103 S.Ct. at 1691 (speech revealing "that a single employee is upset with the status quo," did not raise an issue of public concern). Where an employee's speech is motivated by private personal concerns, *Blum v. Schlegel*, 18 F.3d 1005, 1012 (2d Cir.1994), or involves matters of internal department affairs, the fact that the speech touches on matters of public concern will not render it protected. *Hom v. Squire*, 81 F.3d 969, 974 (10th Cir.1996); *Knowlton v. Greenwood Indep. School Dist.*, 957 F.2d 1172, 1178 (5th Cir.1992) (while information conveyed that is "of relevance to the public's evaluation of the performance of governmental agencies" is a matter of public concern, an employee cannot transform a personal conflict into an issue of public concern simply by arguing that individual concerns might have been of interest to the public under different circumstances).

The parties have cited only one reported case involving writings in a personal journal. There, the Fifth Circuit reversed the district court and found that the personal journal of the plaintiff, a University of Texas police officer, could not support his First Amendment claim. Among other things, the journal criticized plaintiff's supervisor for his policy of mandatory overtime, the lack of supervisory training, and the failure to conduct exit interviews with employees who resigned. *Terrell v. Univ. of Texas Sys. Police*, 792 F.2d 1360, 1361–1362 (5th Cir.), *cert. denied*, 479 U.S. 1064, 107 S.Ct. 948, 93 L.Ed.2d 997 (1987). While it assumed, without deciding, "that an employee's personal notebook or diary can be considered First Amendment speech even though the contents come to light completely without the employee's knowledge or consent," it held that *Connick* barred Terrell's claims because he spoke not *as a citizen* upon matters of public concern, but *as an employee* upon matters of only personal interest. *Id.* In support of its finding, the court explained that plaintiff "made no effort to communicate the contents of the notebook to the public, and the evidence does not suggest that he would have any occasion to do so." *Id.* at 1363.

Several other circuit courts have looked at the entirety of an employee's expression and the motivations of the speaker when determining whether his speech raised a matter of public concern. For example, where an employee complained that "internal politicking [sic], favoritism and clique deprivations" prevented his receiving training or promotion, the Tenth Circuit found that "[g]iven the entirety of [plaintiff's] letter, we are convinced his principal purpose in writing it was not to disclose 'malfeasance on the part of government officials in the conduct of their duties,' but instead to air his frustration at failing to have received a promotion." *McEvoy v. Shoemaker*, 882 F.2d 463, 466 (10th Cir.1989), *criticized by Azzaro v. County of Allegheny*, 110 F.3d 968, 980 (3d Cir.1997) (request by speaker that speech be kept confidential should not be controlling factor in *Connick* analysis). It explained that the court should focus on the "motive of the speaker" and determine whether the employee's "point" was to "bring wrongdoing to light or to raise other issues of public concern because they are issues of public concern," or to "further some purely private interest." *Id.*, (citing *Callaway v. Hafeman*, 832 F.2d 414, 417 (7th Cir.1987)); *Linhart v. Glatfelter*, 771 F.2d 1004, 1010 (7th Cir.1985).

Both the context and the content of Verri's writings reveal that they do not implicate any public concern. As for the context, Verri's criticisms were made in a private diary that only came to Nanna's attention against Verri's will. By writing in his diary, Verri did not intend to speak on a matter of public concern; he desired and expected no audience. While it is true that First Amendment protection can apply when a public employee arranges to communicate privately with his employer, *Connick*, 461 U.S. at 146, 103 S.Ct. at 1689–1690, (citing *Givhan v. Western Line Consolidated School District*, 439 U.S. 410, 415, 99 S.Ct. 693, 697, 58 L.Ed.2d 619 (1979)), Verri did not arrange to communicate with anyone, and we think that the *Terrell* court was correct in finding that the venue of the speech—a private diary—suggests that it was not a matter of public concern.

Moreover, the contents of the diary reveal that it was written for personal interest and motivations—to express his feelings about his personal relationships and vent anger and frustration regarding what he considered to be his unfair treatment by a department of "scumbags" he "can't stand." The diary contains details of his relationship with his wife—their meeting, his feelings toward her, etc. (*See generally* Exh. 3.) It also contains numerous complaints about his situation at the Elmsford Police Department. "This place is really the shit," he wrote on January 6, 1993. "What a waste of time, I have gotten nowhere on this job." *Id.* He complains that "I'm so sick of this place and all its bullshit, who [sic] can do what they want and get away with it while some of us can't even shit without someone commenting." (*Id.*, 3/6/94.) Eighteen pages are apparently notes about "Neuro Linguistics Programming—The study of how to use language to make changes"; these pages include lists of Verri's goals and achievements. It is the final section, entitled "Elmsford Zoo Log," that Verri claims discusses matters of public concern. That section opens with a picture of a penis with the names of Chief Nanna, Officer Weiss and Officer Fanelli written on it. There is also a picture of Chief Nanna pointing out his "poly Sears pants" and his "non-existent ass." Clearly such juvenile doodlings do not raise a matter of public concern, but merely express Verri's personal animus towards Nanna and several other members of the department.

Although plaintiff characterizes the entries that follow the "Elmsford Zoo Log" page as reflecting his "thoughts regarding the maladministration of the department and the goings-on of the department," (Verri Trans. at 149), a closer inspection reveals that, when considered as an entirety, these entries do not raise matters of public concern but merely provide an outlet for personal or intra-departmental grievances. Although the relevant segment is somewhat lengthy, we believe it is helpful to our discussion to reproduce it. These entries are apparently part of what Verri calls the "Elmsford Zoo Log" and as best we could discern from the handwriting, are as follows:

3/2/94 8x4 SHIFT: PATROL CAR 36

SGT FANELLI TELLS ME TO BE MORE DESCRIPTIVE ON MY REPORTS, CONSIDERING HE CAN'T FORM SENTENCES, I FIND THIS AMUSING. HE SHOULD TALK TO WEISS ABOUT HIS REPORTS, MAYBE THE TWO OF THEM CAN GET A 5TH GRADER TO TUTOR THEM ON SENTENCE STRUCTURE AND SPELLING.

3/2

P.O. WEISS HAS A PROBLEM KEEPING ON HIS POST, I DON'T KNOW IF HE IS AWARE THE VILLAGE IS DIVIDED INTO TWO SECTORS. I KEEP SEEING HIM IN MY SECTOR, HE JUST DOES AS HE PLEASES. A [ILLEGIBLE] 18 CAME IN FROM PLEASANTVILLE, ROBBERY, P.O. WEISS THINKS ITS OK TO JUST GO UP AND PARK ON THE SPRAIN S/B, GUESS ITS A NEW PROCEDURE I DON'T KNOW ABOUT.

3/5/94 DESK OFFICER [?]

WOEHRLE 38—GUMBS 37

I DISPATCHED THE FD AFTER 60 CONTROL['S] REQ[UEST] FOR A ROLL OVER ON 287 WESTBOUND WEST OF EXIT 1. I INSTRUCTED WOEHRLE + GUMBS TO DISREG. THE WHISTLE. 5 MINS LATER WOEHRLE INFORMED ME HE WILL BE OUT AT THE SCENE ASSISTING S.P., NEXT THING YOU KNOW, GUMBS IS OUT THERE TOO, BUT HE IS SENIOR MAN AND ALSO CAN DO WHATEVER THE FUCK HE WANTS.

3/6/94 12X8 CAR 37

FANELLI PO WEISS38

0236 HRS WEISS CALLS OUT SAYS HE WILL BE "OUT" WITH GREENBURG AT THE MARRIOTT, THEY HAVE A 29, (HOW DID HE FIND OUT?), GUESS WE CAN RESPOND W/O APPROVAL OR REQUEST.

4/3/94

I CAME IN FOR MY 1ST 8X4 TODAY TO FIND OUT THAT CHRIS HAD LOCKED UP THE REV [ILLEGIBLE] AGEE 9 ELMSFORD LN AFTER A DISPUTE HE BROUGHT HIM IN IN CUFFS ALONG WITH SOME WOMAN, AND AFTER AN UPROAR ALL THE PARTIES WERE RELEASED AFTER SIGNING WAIVERS HE LEFT ALL THAT OUT OF HIS REPORT AND LEFT THE ALLEGED WEAPON (USED TO SMASH A CAR) A BROKEN SNOW SHOVEL, LEANING AGAINST THE LUNCH TABLE, NEEDLESS TO SAY WOEHRLE HAD A GOOD TIME BLOWING IT OUT OF PROPORTION BUT CHRIS IS NOT TO BLAME, THE REAL SHIT HERE IS NONE OTHER THAN—(YOU GUESSED IT) SGT D.H. FANELLI (DICK HEAD) HE DECIDED TO JUST GO HOME AT 2330 WHILE ALL THIS WAS GOING ON, THUS THE MESS. DO YOU THINK HE'LL GET IN ANY SHIT? NOOOOO! THE FUCKING BASTARD

4/5 TUESDAY—DICKHEAD + WEISS + ME.

THE ASSHOLE WAS OUT IN 35 TODAY PLAYING CHIEF. I STOPPED 3 GUYS AT 2 PM ACTING SUSP. IN AN OLD BEAT UP CAR, TURNS OUT UNREG. SO IM DOING THE GUYS, OUT OF THE CAR, AND ALL FI CARDS THE WHOLE BIT, AND THE SCUMBAG WANTS TO KNOW WHERE MY HAT IS. CAN YOU FUCKING BELIEVE THIS? I JUST RID THE VILLAGE OF 3 POSS. BURGS OR WHAT EVER AND THE LOOSER [SIC] IS WORRIED ABOUT A HAT. IF HE EVER WORE ONE WHEN HE WAS A PO. THE ONLY GOOD THING WAS THAT WEISS GOT WRITTEN UP TO [SIC]! HAHA

4/7/94 WOEHRLE + ME + WEH[ILLEGIBLE] 300 TEMP AND I CAN'T DRIVE 38. I WAS MADE TO TAKE 37 WITH NO HEAT. SO AS PAYMENT I AM TAKING THE NEXT 2 OFF SICK.

4/12

BACK FROM 2 DAYS OFF FEEL GREAT— (WOEHRLE: SGT DICKHEAD + WEISS)

4:30

WEISS HAS BEEN IN HQ SINCE 12:30 PROBABLY STUDYING FOR THE SGT TEST. HE'S NEVER GONNA PASS. I GUESS ITS OK TO NOT DO YOUR JOB AND JUST STUDY ALL NIGHT. OH WELL THE SHIT GOES ON.

4/18/94

BACK AGAIN 4x12 WOEHRLE ON THE DESK PERILLA ON THE ROAD (DWI) CAR 36. THE CHIEF IS ON VACATION IN FLA. MAYBE HE'LL GET EATEN BY AN ALLIGATOR OR CHOKE ON SOME BBQ RIBS. WHO AM I KIDDING, HE'LL PROBABLY LIVE TO 90.

5/12/94

BEEN A WHILE SINCE THE LAST ENTRY, NOT THAT THE IDIOT CREW HASN'T BEEN DOING ANYTHING WRONG ITS JUST THAT I'M LAZY.

(Exh. 3.)

It is true that some of his complaints, in a different context, might have been of general public interest. However, this is not sufficient to raise them to the level of public concern. *See Connick*, 461 U.S. at 147, 103 S.Ct. at 1690. Plaintiff's journal entries reflect largely animosity and unhappiness at the favoritism he believes was being shown to co-workers, reflecting more upon intra-departmental management issues than issues of public concern. Although he states in his brief that the writings concern the safety of the Village and the ineffective management of the police department, the entries themselves do not make any connection between his concerns and the larger public. As plaintiff himself testified, the purpose of writing the journal "was to record my thoughts and feelings on various different situations." (Verri Trans. at 117.) Having considered all of the entries and the medium in which they were written, we do not believe that plaintiff's writings raise an issue of public concern.

■■■■ However, because the question of whether Verri's writings amount to a public concern is both novel and complex, we will also address the second prong of a prima facie case of retaliation in violation of the First Amendment—whether the speech at issue was a substantial or motivating factor in adverse employment action taken against Verri.

B. *Whether Verri's Journal was a Substantial or Motivating Factor in Adverse Employment Action Taken Against Him*

In an attempt to show that his speech was a substantial or motivating factor in adverse

actions taken against him, as required by, *e.g.*, *Frank*, 1 F.3d at 1328, in paragraphs 1–20 of his complaint, Verri lists numerous acts allegedly performed by or at the behest of Nanna in retaliation for the entries in his diary. However, his fourth claim is the only one addressing this "retaliation," and it is quite incomprehensible. The claim "repeats and realleges" the allegations of fact in paragraphs 1–20, and then alleges only that "Nanna's retaliatory directive that Plaintiff submit to a breathalyzer test and repeated drug tests" violates Verri's First Amendment rights. Thus, reading the allegations for their plain meaning, it appears that this is the only "retaliatory" action about which Verri complains and that we need to address. However, it is unclear whether Verri's attorney believes that the extremely vague reference to the first twenty fact allegations actually raises a claim based upon those actions as well. To further complicate matters, plaintiff has discontinued several claims originally made in his complaint, and has made additional allegations of retaliatory conduct in his Rule 56.1 statement.[3] Since defendants have addressed the allegations found in paragraphs 1–20 of the complaint and in plaintiff's Rule 56.1 statement as if they actually stated a claim, and in order to avoid a last-minute request by plaintiff to amend his complaint to actually state a claim based upon these facts, we address those "retaliatory acts" that Verri has mentioned in his Rule 56.1 statement and in his brief in opposition.

■ Initially, we note that several of the allegedly retaliatory acts plaintiff alleges were committed by or with the "knowledge and approval" of Nanna require only a cursory discussion, since they were committed before Nanna gained possession of the diary in February of 1995 and, as the Second Circuit has explained, "clearly" a plaintiff cannot base a claim of retaliation upon complained-of acts that predated the speech. *Bernheim v. Litt*, 79 F.3d 318, 325 (2d Cir.1996). Although Verri attempts throughout his papers to challenge the February date as incorrect, we are not persuaded by his argument. In support of his position he makes only the wholly unsupported and circular argument that "[u]nder the circumstances, Plaintiff infers that Nanna received the journal even earlier based on the retaliation Plaintiff was allegedly subjected to beginning in the fall of 1994." (Pl. Br. at 6.) Defendants counter that Nanna did not have possession of the book until February of 1995, and have supplied the affidavits of Chief Nanna, Lt. Rescigno and Dominick Colasuonno in support of their assertion. By contrast, Verri has submitted solely his self-serving surmise mentioned above. As plaintiff himself explains, this type of assertion, based not upon personal knowledge but solely upon conjecture, is insufficient to defeat a motion for summary judgment. (*See* Pl. Br. at 2, (citing *Schwimmer v. Sony Corp. of Am.*, 637 F.2d 41, 45 (2d Cir.1980) (affidavits that are not based upon personal knowledge should be disregarded))); *Cifarelli*, 93 F.3d at 51. Therefore, we reject plaintiff's unsupported assumption that Nanna had the diary before February.

■ In ¶ 13 of the complaint, Verri alleges that "Nanna began following Plaintiff while Plaintiff was on patrol duty and then, in disregard of departmental practice, falsely accused Plaintiff in so-called 'Deficiency Notices' of misconduct."[4] However, when asked in his deposition about the deficiency notices, he testified that he received "numerous" deficiency notices before October of 1994. (Verri Trans. at 327.) Any such notices are irrelevant to this action since they occurred well before Verri lost possession of the book and thus Verri's writings could not possibly have been a substantial motivating factor in their issuance. As noted above, the relevant period for retaliatory acts began in February of 1995, the time when Nanna, Rescigno and Colasuonno averred that the book was given to Nanna, not in the fall of

---

3. This pleading was formerly known as a Local Rule 3(g) statement. The terminology was changed by the April 15, 1997 version of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York.

4. Verri's fourteenth claim also alleges that Nanna and the Village retaliated against him for his exercise of his First Amendment rights by filing deficiency notices in his personnel file. Claim fourteen is also a due process claim, and we address both allegations in part III(B), *infra*.

1994, as Verri "infers." Verri has not produced a single notice issued between the time he claims he lost his book and the filing of this suit.

■ The only evidence in the record of a deficiency notice from the relevant period is one that Chief Nanna testified that he issued to Verri on April 24, 1995 ·for going home while on duty and remaining there for more than twenty minutes. (*See* Exh. 8.) Verri does not dispute that he went home, but states that he had gone to retrieve a radio, with permission. (Verri Trans. at 331–332.) He admitted that there was only one other instance in which he believed Nanna was following him in the one-mile square Village of Elmsford; on that instance Nanna approached him and spoke with him as he sat parked in his patrol car in the parking lot of a department store. (*Id.* at 328.) Verri did not receive a deficiency notice for this incident. Nanna asserts that it occurred in May of 1994, well before Verri claims that Nanna came into possession of the book. (Nanna Reply Aff. ¶ 4; Exh. 16.) We do not find Exhibit 16, an Officer Assignment sheet indicating that Verri was assigned to respond to an incident at the store, to be conclusive on this point, however. Verri could be referring to another occasion he was there. Certainly there is a fact dispute on this point.

■ Regardless, these two instances in which Nanna allegedly approached Verri and spoke to him are not sufficient to raise a genuine issue of fact as to whether Nanna was even following Verri, let alone that any such following was substantially motivated by Verri's speech. Nanna has testified that his regular practice was to patrol Elmsford once before going off duty, (Nanna Aff. ¶ 11), and it is not at all extraordinary that within the confines of the 1–square mile village of Elmsford he would notice Verri twice in an eight-month period.[5] Verri does not counter Nanna's assertion that he regularly patrolled the Village, nor offer any evidence that Nanna approached him more often than he did other officers. Verri's allegation is thus mere unsupported conjecture. Additionally, this type

of groundless speculation about the Chief's motivation for stopping and speaking with him does not amount to the kind of "particularized evidence of direct or circumstantial facts supporting a claim of improper motive" to overcome Nanna's assertion of qualified immunity. Verri has offered no evidence that he was singled out, that Nanna's actions were "highly unusual" or that Nanna otherwise revealed an intention to follow him. *See Blue*, 72 F.3d at 1084. Thus we reject Verri's allegations that his writings were a substantial motivating factor in a campaign by Nanna to follow him and issue improper deficiency notices.

■ Although Verri alleges in his complaint that he was repeatedly subjected to drug testing in violation of his First and Fourth Amendment rights, neither his Rule 56.1 statement nor his brief address this issue, and we assume he now recognizes it is without merit. As the evidence presented by defendants shows, in the eight months between the time Verri claims he lost his book and when he filed suit, he was tested as a primary subject only once and as an alternate only once. (*See* Def. Exh. 7.) An inspection of the drug test subject lists from August of 1994 until April of 1995 reveals that four other officers were on the list twice during that time period as either a primary or an alternate, and one, Thomas Fennel, was on the list three times. (*Id.*) Thus, Verri was tested no more frequently than other members of the department. Moreover, defendants have presented evidence that the entire selection and testing program is run by Industrial Medical Associates, without any input from Nanna. (*See* Aff. of Aryeh Klar; Nanna Aff. ¶ 13.) Verri himself admitted that he had "no idea" whether Chief Nanna had any control over the drug testing system or how the system works. (Verri Trans. at 314.) Thus, since Verri has submitted no evidence in support of his surmise that he was tested in retaliation for his writings, we reject his claim that his right to free speech under the First Amendment has been violated as a result of his being tested for drugs.

---

**5.** As is so often the case with his allegations, plaintiff has not alleged when the "Syms" incident occurred. Thus, we have no actual evidence that it occurred between February and May of 1995, but merely assume, *arguendo*, that it did.

■ Nor was Verri's Fourth Amendment right to be free of unreasonable searches and seizures violated by his being required to submit to drug testing twice in eight months. While a compelled drug urinalysis test is a search and seizure that must satisfy the reasonableness standard of the Fourth Amendment, it is well established that because of the important government interest in assuring that employees in safety-sensitive jobs are free from the effects of drug use during or affecting performance of their work and because of lower expectations of privacy for employees performing such work, the government need not have a warrant or probable cause before requiring a urinalysis test. *Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 617–620, 109 S.Ct. 1402, 1413–1414, 103 L.Ed.2d 639 (1989); *National Treasury Employees Union v. Von Raab*, 489 U.S. 656, 665, 109 S.Ct. 1384, 1390–1391, 103 L.Ed.2d 685 (1989), cited in *Nocera v. New York City Fire Comm'r*, 921 F.Supp. 192, 198–199 (S.D.N.Y.1996). Where the public employer singles out such an employee in a safety-sensitive job and requires the employee to submit to a drug analysis test, the public employer must have reasonable suspicion of drug use by the person subjected to the test. *Nocera*, 921 F.Supp. at 199 (citations omitted). But when the drug urinalysis test is part of a systematic, uniformly applied program, it may meet the reasonableness requirement without requiring a showing of reasonable suspicion that an individual required to be tested had been using drugs. *Nocera*, 921 F.Supp. at 199, (citing *Skinner*, 489 U.S. at 624, 109 S.Ct. at 1417; *Von Raab*, 489 U.S. at 666–668, 109 S.Ct. at 1390–1392). Clearly, a police officer occupies a safety-sensitive job. *See, e.g., Penny v. Kennedy*, 915 F.2d 1065, 1067 (6th Cir.1990). Since defendants have presented evidence that the program is systematically and uniformly applied, and Verri has presented no evidence to the contrary, Verri has failed to establish that his Fourth Amendment rights were violated by Elmsford's drug testing policy.

■ Verri next asserts that Nanna retaliated against him in violation of his First and Fourth Amendment rights by directing Officer Fanelli to make him submit to a breatha-

lyzer test after he got into an accident with a civilian vehicle while driving a police car on November 24, 1994. This accident caused $1100 in damage to the civilian vehicle. (Def.Exh. 5.) Initially, we note that this incident occurred before Nanna received the book in February of 1995, and thus cannot serve as evidence of retaliation. We add, however, that even if the incident had occurred within the proper time-frame, the department regulations in effect at the time require that any officer who has had an accident in a police vehicle involving injury and/or property damage take a breathalyzer test. (*See* Verri Trans. at 239–240, quoting Rule 55.3.7.) Verri admitted receiving a copy of Rule 55.3.7 over 19 months before the accident; indeed, he signed and dated a document verifying its receipt. (*Id.* at 297.) In addition, Nanna averred that he was outside the range of his pager, in Waterville, New York celebrating Thanksgiving at the time of the accident, and that he could not and did not order Fanelli to test plaintiff. (Nanna Aff. ¶ 9.) Verri explained that he bases his belief that Nanna was responsible on a conversation he had with Officer Fanelli at the time. According to Verri, he asked Fanelli why he had to take a test, and Fanelli told him "[t]hat's just what the Chief wants." (Verri Trans. at 244.) Verri couldn't recall whether Officer Fanelli or Lt. Rescigno administered the test. Both, however, have submitted affidavits stating they did not speak with Nanna. Although Verri claims that "several other officers did not take tests after they had accidents" and that he verified this by looking through police accident reports of prior accidents, (*id.* at 250), he has not submitted a single such report to this Court. Thus, although Verri himself asserts that his allegation that he was singled out for testing is verifiable, he again fails to support it by anything other than his own conjecture. As noted above, this showing is inadequate to establish that his writings were a substantial motivating factor in the decision to have him submit to the breathalyzer test.

■ Thus, since Verri has not adduced any evidence that his writings played any role in the decision, we find that his First Amendment rights have not been violated by

the administration of the breathalyzer test. Similarly, because Verri has not provided any evidence that the breathalyzer policy was not systematically and uniformly applied to police officers after they were involved in accidents while on duty, nor has he shown that it is unreasonable to suspect an individual officer of using alcohol after he has an accident causing property damage, he has failed to establish that his Fourth Amendment rights were violated by his being required to submit to a breathalyzer test.

■ Next, attempting again to rely upon incidents that were not alleged in the complaint and that apparently are not within the relevant time period, Verri alleges for the first time in his Rule 56.1 statement that "Nanna directed an officer to ticket his motorcycle." (Pl. Rule 56.1 Stmt. ¶ 15.) Verri has not provided a copy of this ticket for the record, and cannot recall the general time frame in which he received it. (Verri Trans. at 404.) Defendants state that the ticket was given in 1994, apparently since Verri testified that in 1994 he regained possession of his motorcycle from a person to whom he had tried to sell it. (*Id.*) Plaintiff himself testifies he got the ticket while parked illegally in front of his uniform store, (*id.* at 405), and Dominick Colasuonno averred that by February of 1995 when he found the book, his partnership with Verri had ended and Colasuonno had established business elsewhere. Thus, since the only evidence in the record suggests that the ticket was issued before Nanna had received the book in February of 1995, we reject Verri's assertion that his writings were a substantial motivating factor in the decision to issue him a ticket for his motorcycle.

Verri's Rule 56.1 statement also refers to an incident in which he was disciplined for dropping an ailing person off in the parking lot of the Westchester County Medical Center Emergency Room and driving off.[6] However, he fails to mention that this incident occurred in 1992. (*See* Def. Exh. 14.) Thus, there is no way that his writings could have been a substantial motivating factor in the decision to impose this discipline—the writings hadn't even been written yet, let alone read by Nanna!

■ Verri alleges in his complaint that he was passed over for promotion in retaliation for his criticism of Nanna in the book. Like several of his other allegations, he hardly addresses this claim at all in his motion papers, stating only that the entries in the book were made "well in advance of the civil service Sergeant's exam and any appointments off the eligible list based on the exams [sic] results, which list is dated 11/25/94." (Rule 56.1 Stmt. ¶ 8.) The brevity and generality of this argument suggests that Verri now recognizes that this claim too is without merit. Initially, we note that the time when Verri made these entries is entirely irrelevant—the critical time is when Nanna became aware of them. The two promotions made from that exam were made before Nanna received the book and could not have been in retaliation for its contents. Second, defendants have established that plaintiff took an exam to qualify for promotion in which he placed fifth out of six. According to New York Civil Service Law § 61(1) and the Westchester County Guidelines, Verri was not eligible for either promotion.[7] (*See* Westchester Guidelines, Exh. 11.) As revealed above, Verri does not counter this argument. Thus, even had this decision been made in the relevant time period, Verri could not have established that his writings were a "substantial motivating factor" in the promotion decisions. Moreover, Verri admits that while Nanna recommended Weiss for

---

6. Verri later admitted that the person was subsequently found in the bushes near the hospital in diabetic shock. (Verri Trans. at 408.)

7. The scores on the test were: Weiss 85, Des Marais 74, Califana 73, Woehrle 73, Verri 71 and Perilli 70. With such a distribution, according to § 61(1) and the Westchester Guidelines for ties, the first four scores would be eligible for the first promotion. Weiss was chosen. Thus, for the second promotion, the scores were 74, 73, 73, 71 and 70. According to the Westchester tie guidelines, the first 3 scores would be eligible—Des Marais, Califana and Woehrle. An inspection of the Westchester guidelines suggests that they are set up to take the three highest scores. Where the third score is a tie, however, everyone achieving that score is eligible. Verri did not achieve that score (73), but was below it. Thus, he was not eligible for promotion.

the first promotion, he made no recommendations as to the second. (Verri Trans. at 373; Nanna Aff. 10.) Thus, because these promotions occurred before Nanna received the book, and because Verri was never eligible for the promotions, we reject any claim that Verri's writings were a substantial motivating factor in "passing him up" for promotion.

Lastly, plaintiff alleges that "Nanna apparently circulated the journal to Sgts. Fanelli, Woehrle and Weiss. Indeed, Weiss admitted discussing the journal with his wife and other police officers. Thereafter, they too subjected plaintiff to constant retaliatory acts." (Verri Rule 56.1 Stmt. ¶ 16; Verri Trans. at 378; Weiss Trans. at 9.) Again, plaintiff's statements are misleading. Sergeant Weiss admitted that he spoke to his wife about the diary *after he heard about it in the newspapers.* (Weiss Trans. at 9.) It was plaintiff's attorney who contacted several major television stations and "whatever media [plaintiff] thought appropriate." (Verri Trans. at 383.) Regardless, this allegation comes nowhere close to setting forth *"specific facts* showing there is a genuine issue for trial." *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511 (emphasis added). Verri has offered no evidence that Nanna distributed the journal, and no description of the retaliatory acts to which Verri was allegedly subjected by the other officers. Therefore, we reject this allegation as vague and unsupported by evidence.

Thus, because Verri's writings did not amount to a matter of public concern and he has not presented sufficient evidence that they were a substantial motivating factor in any adverse employment action taken against him, or that defendants' lacked probable cause to subject him to the breathalyzer test or to drug screening, we grant defendants' summary judgment motion on Verri's fourth claim.[8]

### III. *Verri's Due Process Claims*

■ Verri's first and fourteenth claims allege violations of his Fourteenth Amendment right to due process. A court "examines procedural due process questions in two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the state[;] the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient." *Kentucky Dept. of Corrections v. Thompson,* 490 U.S. 454, 460, 109 S.Ct. 1904, 1908, 104 L.Ed.2d 506 (1989). We apply this two-step analysis to Verri's due process claims below.

### A. *Nanna's Retention of the Diary*

■ Verri's first claim alleges that Nanna's "permanent withholding" of the diary deprived him of property without due process, in violation of the Fourteenth Amendment.[9] The Supreme Court has held that "[p]roperty interests ... are created and their dimensions defined by existing rules or understandings that stem from an independent source such as state law...." *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). Defendants urge that since Verri did not know the whereabouts of his book since the fall of 1994, under state law, he did not have a property right in the book. We reject that argument.

The exact circumstances under which Colasuonno came into possession of Verri's journal are unclear. Verri's admission that he last saw the journal in the fall of 1994 suggests that it was lost or mislaid. Regardless of whether the journal was lost or mislaid by Verri and found by Colasuonno, or whether Colasuonno stole the journal from Verri, Verri still retained his property rights in the journal. *See Fuentes v. Wendt,* 106 Misc.2d

---

8. Although our holding outlined above, that Verri's writings do not raise a matter a public concern, was unnecessary in light of our conclusion that Verri's writings were not a motivating factor in any adverse employment action taken against him, we chose to reach the prior issue at this point because Verri has filed several other lawsuits in this Court, based at least in part on his diaries, and because his fourteenth claim alleges

that Nanna retained his diary in retaliation for his exercise of his free speech rights.

9. Since Elmsford's attorney turned the diary over to Verri in July after Verri filed suit in May, (Nanna Trans. at 26), any deprivation that Verri suffered would be not be permanent, but merely temporary, with *de minimis* injury to him.

1030, 436 N.Y.S.2d 801, 802–803 (Sup.Ct. Kings Cnty.1981) (at the time property is found, the finder acquires no right to property; rather, all he has is an expectation, which may ripen into a possessory interest provided that the owner has not come forward and the finder makes a demand therefor); *Wells Fargo Bank Intern. v. Binabdulaziz,* 124 Misc.2d 1072, 478 N.Y.S.2d 580, 581 (Sup.Ct. Onondaga Cnty.1984) (he who finds and keeps property he knows belongs to another must restore the property involved); *Phelps v. McQuade,* 220 N.Y. 232, 234, 115 N.E. 441 (Ct.App.1917) (no title can be acquired from a thief); *Hardeman v. Mendon,* 87 A.D.2d 232, 450 N.Y.S.2d 808, 813 (1st Dept.1982) (same), *aff'd,* 58 N.Y.2d 892, 460 N.Y.S.2d 499, 447 N.E.2d 47 (Ct.App.1983); N.Y.C.P.L.R. § 7101 (1980) ("Action for Recovery of Chattel") Practice Commentaries C7101:3 (no demand need be made unless defendant lawfully acquired the chattel but unlawfully detained it (detinue) or was a purchaser for value without notice of plaintiff's rights therein).

■ In the alternative, Nanna argues that Verri was not entitled to immediate possession of his journal because Nanna was entitled to examine it, and therefore Verri cannot be said to have a property interest in the book. We think this argument goes to the type of process to which Verri was entitled, not to the issue of whether the book was his property. Verri clearly made a demand upon Nanna for the return of his property, only two weeks after Nanna received it from Colasuonno. Thus, we conclude that Verri indeed had a property interest in his book, and we turn now to the more difficult question of the process to which he was entitled after Nanna came into possession of it.

■ In general, due process entitles a person to notice and hearing before he is deprived of a property right. *Cleveland Board of Education v. Loudermill,* 470 U.S. 532, 542, 105 S.Ct. 1487, 1493, 84 L.Ed.2d 494 (1985); *U.S. v. Monsanto,* 924 F.2d 1186, 1192 (2d Cir.), *cert. denied,* 502 U.S. 943, 112 S.Ct. 382, 116 L.Ed.2d 333 (1991). However, the Supreme Court has held that where the deprivation is a "random and unauthorized" act of a state employee, due process does not require a pre-deprivation hearing; post-deprivation resort to state tort remedies is sufficient. *Parratt v. Taylor,* 451 U.S. 527, 541, 101 S.Ct. 1908, 1916, 68 L.Ed.2d 420 (1981) (negligent deprivation of hobby kit did not require pre-deprivation hearing), *overruled on other grounds, Daniels v. Williams,* 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (negligent acts cannot support a § 1983 violation); *Hudson v. Palmer,* 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984) (extending *Parratt* to intentional acts). The *Parratt* Court reasoned that:

> [the] tortious loss of a prisoner's property as a result of a random and unauthorized act by a state employee.... is not [the] result of some established state procedure and the State cannot predict precisely when the loss will occur. It is difficult to conceive of how the State could provide a meaningful hearing before the deprivation takes place.... Indeed, in most cases it is not only impracticable, but impossible, to provide a meaningful hearing before the deprivation.

*Id., quoted in Dwyer v. Regan,* 777 F.2d 825, 832–832 (2d Cir.1985); *Cook v. City of New York,* 607 F.Supp. 702, 704 (S.D.N.Y.1985) (state rights of action for replevin, conversion, and negligence afford a sufficient post-deprivation remedy for due process purposes); *Washington Square Post No. 1212 American Legion v. City of New York,* 720 F.Supp. 337, 351–352 (S.D.N.Y.1989) (New York state law afforded adequate remedy to persons whose property was taken or damaged during a police/FBI search), *rev'd in part on other grounds,* 907 F.2d 1288 (2d Civ. 1990).

■ The Second Circuit has refined this doctrine, however, to differentiate between the "random and unauthorized" deprivations effected by low level state officials, and those effected by high-level decision-makers. *Dwyer,* 777 F.2d at 831–33. Focusing upon the Court's reliance in *Parratt* upon the unforseeability of actions of lower-echelon employees, it found that the same actions undertaken by "high-ranking officials having final authority over the decision-making process" could not also be considered "random and unauthorized," but that these high level offi-

cials' ability to plan and control their own actions properly could be imputed to the state. *Id.* Thus, in *Dwyer*, it found that where an employee had been arbitrarily and vengefully singled out for termination by the Head of the New York State Employees Retirement System, the employee was entitled to a pre-termination hearing.

■■■■ Verri argues that Nanna is the type of high-level decision-maker whose actions impose a due process requirement of a pre-deprivation hearing in this case. Elmsford has challenged Verri's assertion that Nanna is a high-level policymaker, however, arguing that for the purposes of municipal liability under § 1983, Nanna is not a final policymaker regarding the actions he took after he received Verri's diary.[10] See *Sullivan v. Town of Salem,* 805 F.2d 81, 86 (2d Cir.1986) (question of policymaker status for the purposes of municipal liability under § 1983 is helpful for the purposes of "random and unauthorized" inquiry under due process analysis). The often difficult question of whether a particular official is a final policymaker is to be determined by the court. *McMillian v. Monroe Cnty., Ala.,* ― U.S. ――, ―― – ――, 117 S.Ct. 1734, 1736–1737, 138 L.Ed.2d 1 (1997). An official may have discretion in his job yet not be a final decision-maker. As the Supreme Court explained:

> [w]hen an official's discretionary decisions are constrained by policies not of that official's making, those policies, rather than the subordinate's departures from them, are the act of the municipality. Similarly, when a subordinate's decision is subject to review by the municipality's authorized policy-makers, they have retained the authority to measure the official's conduct for conformance with their policies. If the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final.

*St. Louis v. Praprotnik,* 485 U.S. 112, 127, 108 S.Ct. 915, 926, 99 L.Ed.2d 107 (1988). This explanation is consistent with the following illustrative example from *Pembaur:*

> the County Sheriff may have discretion to hire and fire employees without also being the county official responsible for establishing county employment policy. If this were the case, the Sheriff's decisions respecting employment would not give rise to municipal liability, although similar decisions with respect to law enforcement practices, over which the sheriff is the official policymaker, would give rise to municipal liability.

*Pembaur,* 475 U.S. at 483 n. 12, 106 S.Ct. at 1300 n. 12. Moreover, the "[m]ere failure to investigate the basis of a subordinate's discretionary decisions does not amount to a delegation of policymaking authority, especially where ... the wrongfulness of the subordinate's decision arises from a retaliatory motive or other unstated rationale." *Praprotnik,* 485 U.S. at 130, 108 S.Ct. at 928.

■■■ When determining whether a particular official is a final policymaker, the court should look to the definition of the official's functions under relevant state law to get an understanding of the actual function of the official in a particular area. *McMillian,* ― U.S. at ――, 117 S.Ct. at 1737. Contrary to Verri's assertion, Elmsford argues that Nanna was not a final policymaker for any actions he took against Verri regarding his diary because although Nanna's actions were discretionary, "they were at all times subject to review by the Village Board, who, pursuant to the Village of Elmsford Police Department Rules and Regulations, which they adopted, retained final policy making authority over both Nanna and Verri." (Weiss Br. at 6.) However, neither party has submitted the relevant Police Department Rules and Regulations, nor any other relevant portions of state law, that would establish exactly where final policymaking authority lay over

---

**10.** Although municipalities are persons subject to suit under § 1983, they may not be held liable merely on a respondeat superior theory, but only if the alleged constitutional tort was caused by the execution of a government's policy or custom. *Monell v. New York City Dept. of Social Serv.,* 436 U.S. 658, 690 & 694, 98 S.Ct. 2018, 2035–2036, 2037–2038, 56 L.Ed.2d 611 (1978). In appropriate circumstances, liability can be based upon a single decision by a municipal official with final policy-making authority. *Pembaur v. Cincinnati,* 475 U.S. 469, 480, 106 S.Ct. 1292, 1298–1299, 89 L.Ed.2d 452 (1986).

the actions Nanna took regarding Verri's diary.

■ Even if we assume, for the purposes of this motion, that by virtue of his position as Police Chief, Nanna possessed final decision-making authority in areas relevant to this action, Verri has not proven that his due process rights were violated. Verri has not clearly alleged what process he believes he was due, and while his supplemental memorandum of law suggests he believes he was entitled to a pre-deprivation hearing, (*see* 6/13/97 Ltr.), Verri's due process rights in this situation are not clear cut, in part because the facts of this case are not as straight forward as a deprivation wrongful from the outset. As discussed above, Nanna did not come into possession of the diary wrongfully; in fact, he played no part in obtaining the journal but was simply given it by Lt. Rescigno without any solicitation on his part. Thus, even were Nanna to be found a high-ranking official whose actions can be imputed to the state, we can conceive of no possible pre-deprivation hearing that Verri could have been afforded before Nanna unexpectedly gained possession of the diary in February of 1995.[11] Therefore, the only possible hearing that Verri could have been afforded would have been after Nanna came into possession of the book. Although there is a dispute as to exactly what process Verri was actually afforded in connection with his deprivation of the book,[12] we do not believe that under any version of the facts Verri's constitutional rights were violated. Nowhere does Verri testify that he requested a hearing, and we do not believe that Elmsford was obligated to provide a hearing *sua sponte.* In *Dwyer,* the Court determined that where an employee's position was being eliminated, the state need not routinely provide a pre-

termination hearing, but must only do so where it has requested, and dismissed the complaint to allow Dwyer to allege that he had made such a request. *Dwyer,* 777 F.2d at 833–834. We believe that in this highly unusual situation, Elmsford was not obligated to provide a hearing where Verri did not request one.[13]

Nor do we agree with Verri's suggestion that he was entitled to immediate return of the diary under NEW YORK PERS. PROP. LAW § 252 (Found Property). The law of found property, designed to resolve disputes in situations where the owner of property is unknown or cannot be found, should be not be blindly transplanted into this unique circumstance. The due process analysis here must take into account the legitimate interests of the police department in investigating hostile and disgruntled employees. In this situation, the department has a strong interest in insuring that Verri was mentally fit to continue serving as an armed police officer. *See, e.g., Kelley v. Johnson,* 425 U.S. 238, 245–246, 96 S.Ct. 1440, 1444–1445, 47 L.Ed.2d 708 (1976) (relying by analogy on *Pickering,* county's choice of organizational policy that gave weight to "overall need for discipline, esprit de corps, and uniformity" justified conclusion that police policy limiting hair length does not violate Fourteenth Amendment); *Crain v. Board of Police Comm'rs,* 920 F.2d 1402, 1409 (8th Cir.1990) (the police department, as a paramilitary organization, must be given considerably more latitude in its decisions regarding discipline and personnel regulations than the ordinary government employer); *Connor v. Clinton Cnty. Prison, et. al,* 963 F.Supp. 442, 450 (M.D.Pa.1997) ("keeping a secret diary on purported violations by a supervisor leads to mistrust in an office"— in context of a prison, security concerns are inherent, and "mistrust among employees

---

11. As discussed on p. 788, *supra,* we reject Verri's unsupported claim that Nanna had possession of the diary earlier than February.

12. Although Nanna swears in his affidavit he told Verri he was going to give him the book back "in short order," (Nanna Aff. ¶ 5), Verri testified that Nanna denied his request to return the book and told him "he was going to hold on to it [the book] for a while so that every once in a while he could read through it again." (Verri Trans. at 226.) Verri also testified that Nanna told him "it prob-

ably was best that I seek employment elsewhere" and "suggested that I forget that I wrote the book and that I forget that he had the book." (*Id.* at 282.)

13. Nanna in fact called Verri into his office and informed him he had the book, at which time Verri requested it be returned. If Nanna were the final policy-maker as Verri argues, query whether this meeting would constitute a "hearing" for due process purposes?

would be a special problem") (citing *Busby v. City of Orlando*, 931 F.2d 764, 774 (11th Cir.1991) (need for discipline heightened in "quasi-military" organizations such as police departments due to close working relationship)); *Policemen's Benev. Ass'n of New Jersey v. Township of Washington*, 850 F.2d 133, 141 (3d Cir.) (upholding drug testing of police because they are "members of quasimilitary organizations, called upon for duty at all times, armed at almost all times, and exercising the most awesome and dangerous power that a democratic state possess with respect to its residents—the power to arrest and detain them."), *cert. denied*, 490 U.S. 1004, 109 S.Ct. 1637, 104 L.Ed.2d 153 (1989).

■ This was a very complicated and unusual situation, in which a Police Chief, solely through the action of others, came into possession of the diary of one of his employees, a police officer, that revealed the officer to be hostile and extremely dissatisfied with his job and his coworkers. Nanna asserts, and we agree with him, that in that situation, as the Chief of Police, he was entitled and indeed had a responsibility to the people of Elmsford, to evaluate the diary in order to determine whether Plaintiff was mentally competent to continue serving as a police officer who carried a weapon. Nanna also had responsibility in his role as supervisor of the department to evaluate the journal to determine whether Verri's attitudes and treatment of other members of the department were undermining department morale and effectiveness. These concerns have great weight in the traditional due process analysis, which entails a balancing of three factors:

First, the private interest that will be affected by the official action; second, the risk of erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Monsanto*, 924 F.2d at 1193. Here, where the private interest in Verri's diary was di-minished since he had not seen it for several months and Nanna had informed him he had the diary, thus reducing the risk that it would be harmed, we do not believe that Verri's interest in having the diary immediately returned outweighed Elmsford's compelling interest in immediately assessing the fitness of one of its officers. Although Nanna could have, and perhaps should have, copied the diary and returned the original, we do not believe his failure to do so in this situation amounts to a constitutional violation. An analysis of analogous cases leads us to conclude that Nanna was entitled to retain the diary for the three months that he had it.

Although we could find no cases discussing a police officer's due process rights when a member of the public turns his diary over to the Police Chief for evaluation, we did find helpful several Fourth Amendment cases analyzing the right of the police to detain personal property as evidence of a crime, as well as those considering an employer's rights to investigate an employee for work-related misfeasance.

■ In *Terranova v. State of New York*, 111 Misc.2d 1089, 445 N.Y.S.2d 965, 970 (N.Y.Ct.Cl.1982), the Court of Claims of New York held that where the police had a valid warrant to seize personal property to investigate a crime, they were entitled to detain the property and were liable only for any damage done to the property while it was detained, but not for any damages arising as a result of the detention itself. Thus, because of the privilege the police enjoy to detain personal property for investigation, had Nanna had a warrant to search Verri's diary, Verri's due process rights would not be violated by its detention. While here, Nanna did not have a warrant, consent or other formal permission to search Verri's diary, we think that the Supreme Court's holding in *O'Connor v. Ortega*, 480 U.S. 709, 723, 107 S.Ct. 1492, 1500–1501, 94 L.Ed.2d 714 (1987), demonstrates that in this situation, such permission was not necessary. In *O'Connor*, the Court held that even where a governmental employee has a reasonable expectation of privacy in the items his employer desires to search, where the employer is seeking to investigate the employee's belongings for evi-

dence of a work-related misfeasance, the government's interest in the efficient and proper operation of the agency justifies dispensing with the warrant requirement and lowering the standard of review of the propriety of the search from the usual "probable cause" to the more lenient "reasonableness" standard. *Id.* The Court noted that the search must be "reasonable" in both its inception and as actually conducted. *Id.* at 726, 107 S.Ct. at 1502.

 Since the Supreme Court has held that the Fourth Amendment is not violated when an employer has reasonable grounds to suspect that the search will turn up evidence of work-related misconduct, and has endorsed the usage of such searches without a warrant or other prior approval mechanism, we think it goes without saying that this process, endorsed for Fourth Amendment purposes, cannot be a violation of due process. Therefore, by analogy, if Nanna's search and detention of the diary was reasonable, the process afforded Verri by the Fourth Amendment was not violated. Here, we think that after receiving the diary, already missing for four months, on a tip from friend of Verri's, Nanna's informing Verri he had the book and subsequently detaining it for three months [14] in order to allow the police psychiatrist to investigate the troubling contents was reasonable. There is no doubt that Nanna's detention could not reasonably go on indefinitely. *See* 23 N.Y.JUR.2D § 30, "Conversion and Action for Recovery of Chattel" (even one whose taking and possession of property were originally lawful incurs liability for conversion in detaining property for an unreasonable length of time, or by absolutely refusing to return it), (citing, *e.g., Landsman Packing Co. v. Continental Can Co.* 864 F.2d 721, 733 (11th Cir.1989) (construing New York law)). However, we think that the three-month period at issue here was not a violation of Verri's Fourth Amendment or due process rights. In this case, the book has been returned and any damage resulting from the amount of

time it was detained is *de minimis.* Thus, we conclude that Verri has not suffered a constitutional injury. Had the book been damaged, Verri would have a state law claim for such damage. Therefore, we grant defendant Nanna's motion for summary judgment on Verri's first claim.

**B.** *Nanna's Alleged Placement of Deficiency Notices in Verri's File*

Verri's fourteenth claim alleges, *inter alia,* that Nanna's and the Village's retaliatory filing in Plaintiff's personnel file of "Deficiency Notices" deprived him of a liberty interest in his reputation and thus violated his right to due process as guaranteed him by reason of Section 5711–q of the Unconsolidated Laws of New York. (*See* Def. 6/13/97 Ltr. at 4.) The basis for this claim is his allegation that Nanna pulled several deficiency notices out of his personnel file during a meeting to review the file. (Verri Trans. at 335.) He could not remember the date of the meeting, however. Although defendants again have addressed only Verri's Fourteenth Amendment due process rights, (as opposed to those affored by the New York state law), our conclusion that Section 5711–q is not violated by the placement of a deficiency notice in a file, enables us to reach any state claims that Verri would have as well.

Although a deficiency notice is in effect a written memorialization of an impropriety of the employee, defendants argue that it does not result in any formal departmental reprimand, but is comparable to an oral correction from a superior officer. (Nanna Aff. ¶ 12.) [15] The issue of whether any deficiency notices were ever placed in Verri's file is hotly contested. Chief Nanna averred that he "did not pull any deficiency notices out of any personnel folder and no deficiency notice was ever placed in [Verri's] personnel file." (Nanna Aff. ¶ 12.) As discussed in part II(B), *supra,* there is evidence in the record of only one deficiency notice that Verri received after Nanna was given the diary. Thus, in order for there to have been more

---

14. Apparently, Nanna turned the diary over to his attorney when the suit was filed in May, and his attorney turned it over to Verri in July.

15. Verri himself acknowledges he was never disciplined with respect to the numerous deficiency notices he received before he was commended in October 1994. (Verri Trans. at 327–328.)

than one notice placed in Verri's file, members of the Elmsford Police Department would either have had to have placed prior notices in the file before the diary came to light, or to have gone back after the diary was found, and placed numerous unidentified prior deficiency notices in his file.[16] Both of these scenarios seem quite implausible.

Giving Verri the benefit of the doubt, as we must on a motion for summary judgment, that at least one deficiency notice was placed in his file without a prior hearing, we must next determine whether his due process rights were thus violated.[17] Plaintiff argues that Section 5711–q of the Unconsolidated Laws of New York provides him a due process right to a prior hearing in connection with disciplinary actions taken against him that has been violated by Nanna.[18] The Supreme Court has often warned, however, that it was not the intention of § 1983 to constitutionalize state tort law. *Paul v. Davis,* 424 U.S. 693, 701, 96 S.Ct. 1155, 1160, 47 L.Ed.2d 405 (1976). Accordingly, the Second Circuit has held that "a violation of state law neither gives [plaintiff] a § 1983 claim nor deprives defendants of the defense of qualified immunity to a proper § 1983 claim." *Robison v. Via,* 821 F.2d 913, 922 (2d Cir.1987) (citations omitted) (due process). "Federal constitutional standards rather than state statutes define the requirements of procedural due process." *Id.* at 923. Thus, Verri must be able first to establish a liberty interest in his reputation recognized under federal constitutional standards and, second, to show that under these standards he was entitled to a hearing before being deprived of that interest.

Verri asserts that as a police officer, he has a constitutionally cognizable liberty interest in his reputation. Courts have determined that "the 'liberty' interest protected by the due process clause includes in certain circumstances the right to contest at a hearing public, stigmatizing governmental accusations...." *O'Neill v. City of Auburn,* 23 F.3d 685, 691 (2d Cir.1994). Since due process only affords a person an opportunity to clear his name, a plaintiff must allege that the alleged stigmatizing information in his file was false. *Brandt v. Board of Co-op. Educ. Servs.,* 820 F.2d 41, 43 (2d Cir.1987), (citing *Codd v. Velger,* 429 U.S. 624, 627, 97 S.Ct. 882, 883–884, 51 L.Ed.2d 92 (1977)). Verri has failed to allege that any notices placed in his file were false, and thus his claim fails on this point alone.

Even were Verri to amend his complaint to allege falsity, his claim would still fail. The Supreme Court has held that "reputation alone, apart from some more tangible interests, such as employment," is neither " 'liberty' " nor " 'property' by itself sufficient to invoke the procedural protection of the Due Process Clause." *Paul v. Davis,* 424 U.S. 693, 701, 96 S.Ct. 1155, 1161, 47 L.Ed.2d 405 (1976). The Second Circuit has interpreted *Paul* to require some "stigma plus" be established before mere defamation will rise to the level of a constitutional deprivation. *Martz v. Inc. Village of Valley Stream,* 22 F.3d 26, 31–32 (2d Cir.1994), (citing *Easton v. Sundram,* 947 F.2d 1011, 1016 (2d Cir.1991), *cert. denied,* 504 U.S. 911, 112 S.Ct. 1943, 118 L.Ed.2d 548 (1992)); *Neu v. Corcoran,* 869 F.2d 662, 667 (2d Cir.), *cert. denied,* 493 U.S. 816, 110 S.Ct. 66, 107 L.Ed.2d 33 (1989)). In attempting to deter-

---

**16.** Verri admitted that the usual practice was for the officer issuing the notice to retain it. (Verri Trans. at 336.)

**17.** Again, since defendants have not convinced us otherwise, for the purposes of analysis of Verri's fourteenth claim we will assume that Nanna was a final policymaker as regards a decision to place deficiency notices in Verri's file. This assumption is subject to considerable doubt, however, because Verri argues that Nanna deprived him of a liberty interest by violating state law, and at least one court has held that where an official is bound by controlling state law, he is not a final policymaker on that issue. *See* fn. 13, *infra,*

*Kaufman v. City of New York,* No. 87 Civ. 4492, 1992 WL 247039 *3–4 (S.D.N.Y. September 17, 1992).

**18.** Section 5711–q(9) mandates in part that:

[N]o member or members of [a] police force shall be fined, reprimanded, removed or dismissed until written charges shall have been made and preferred against him or them, nor until such charges have been investigated, examined, heard and determined by such board of trustees....

N.Y. MUNICIPALITIES § 5711(q) (McKinney's Unconsolidated Laws of New York 1979).

mine what the "plus" is, the court has stated that:

> defamation ... is not a deprivation of a liberty interest unless it occurs in the course of dismissal or during termination or alteration of some other legal right or status.... [T]he "plus" is not only significant damage to a person's employment opportunities, but dismissal from a government job or deprivation of some other legal right or status.

*Neu*, 869 F.2d at 667; *see also Easton*, 947 F.2d at 1016; *Donato v. Plainview–Old Bethpage Cent. School Dist.*, 96 F.3d 623, 630 (2d Cir.), *cert. denied*, —— U.S. ——, 117 S.Ct. 1083, 137 L.Ed.2d 218 (1997) (a free-standing defamatory statement made by a state official about an employee is not a constitutional deprivation but is properly viewed as a state tort of defamation, unless it is made during the course of that employee's termination from employment); *see also Martz*, 22 F.3d at 31–32; *Brandt*, 820 F.2d at 43 (liberty interest implicated when public governmental charges accompanying dismissal impose stigma that impairs opportunity to obtain other employment).

 Verri was not terminated. Thus, his only hope of establishing a due process violation is to show deprivation of some other right or status. Such rights or status can in some instances be created by state law. *See, e.g., Paul*, 424 U.S. at 708, 96 S.Ct. at 1164 (taking away of right under state law to purchase liquor significantly altered plaintiff's status). The Supreme Court has held that in order for a state statute to create a protected liberty interest, it must use "explicitly mandatory language" in connection with the establishment of "specified substantive predicates to limit discretion." *Kentucky Dept. of Corrections*, 490 U.S. at 463, 109 S.Ct. at 1910 (citations omitted) (where particularized standards are given to limit state's discretion, law creates a liberty interest). Verri argues that § 5711–q creates a protected liberty interest in not having deficiency notices placed in his file without a prior hearing. While § 5711–q does have mandatory language forbidding fine, reprimand or dismissal without written charges, an investigation and a hearing—require-

ments sufficient to create a protected liberty interest in a hearing before being reprimanded—it appears likely that New York courts would not consider mere placement of a deficiency notice in an officer's personnel file to violate that interest.

██ In a case involving the placement of two memoranda in plaintiff police sergeant's personnel file charging him with violating department regulations, the Second Department found that the placement was neither a "disciplinary proceeding" nor "any other matter which is otherwise reviewable pursuant to law or any rule or regulation having the force and effect of law." *DeVito v. City of Rye*, 154 A.D.2d 373, 546 N.Y.S.2d 869, 870–71 (2d Dept.1989) (citing *Holt v. Board of Education*, 52 N.Y.2d 625, 439 N.Y.S.2d 839, 422 N.E.2d 499 (1981)); *Tomaka v. Evans–Brant Cent. School Dist.*, 107 A.D.2d 1078, 486 N.Y.S.2d 546 (4th Dept.1985)). In *Holt*, the New York Supreme Court found that placement in a teacher's personnel file of a written administrative communication criticizing the teacher's performance or conduct did not violate § 3020–a of the Education Law, which provides a right to a hearing when "charges" are filed against a tenured teacher. The *Holt* court determined that the purpose of § 3020–a was to protect teachers from arbitrary imposition of formal discipline, and not to prevent administrators from providing negative written evaluations of teachers, without having to file formal disciplinary charges. The court noted that while the language of the administrative letters might appear to be in the nature of a " 'reprimand' within the literal meaning of that word," it fell "far short of the sort of formal reprimand contemplated by the statute." *Id.* 439 N.Y.S.2d at 843, 422 N.E.2d at 502–503. As it explained:

> Although the sharply critical content of the letters is unmistakable, the purpose of such communications—to call to the teacher's attention a relatively minor breach of school policy and to encourage compliance with that policy in the future is also clear. The purpose is to warn, and hopefully to instruct—not to punish. Further, the documents in question are issued by a single administrator. ·While the inclusion of such

letters in the teacher's permanent file may have some effect of his future advancement or potential employability elsewhere, it is by no means as damaging as a formal reprimand issued by the board of education as the result of a determination of misconduct made by an impartial hearing panel.

Similarly, in *Tomaka,* a clerk stenographer brought suit seeking to have a letter admonishing her for insubordinate action removed from her personnel file, alleging that she was entitled to a prior hearing under Civil Service Law § 75, which provided that qualified employees "shall not be removed or otherwise subjected to any disciplinary penalty . . . except for incompetency or misconduct shown after a hearing upon stated charges pursuant to this section." *Tomaka,* 486 N.Y.S.2d at 547; CIVIL SERVICE LAW § 75 (McKinney 1985). Relying upon *Holt,* the Court concluded that the letter, which stated her actions were contrary to the principal's directive, was not a formal reprimand as contemplated by § 75.

 Consistent with these cases, we believe that the New York courts would not consider placement of a deficiency notice in an officer's personnel file without a prior hearing a violation of § 5711–q. While it is true that § 5711–q uses the term "reprimand," while § 3020–a of the Education Law and § 75 of the Civil Service Law do not, we do not believe the non-existence of this phrase was critical to the finding of those courts. The *Holt* court was careful to distinguish what it termed the "reprimand" in that case from the "formal reprimand" contemplated by the statute. We think the same distinction holds under § 5711–q. We believe that the statute contemplates a hearing be afforded for a formal reprimand, not simply for written warnings on minor infrac-

tions, intended more as instruction than as formal punishment. *See Holt, supra.* Thus, § 5711–q cannot serve as the source of "some other legal right or status" that would afford Verri a liberty interest in not having deficiency notices placed in his file. However, had these alleged deficiency notices actually been used as the basis for a formal reprimand, a fine or dismissal, we likely would reach a different conclusion. Verri has alleged no specific formal reprimand, fine or dismissal that he has incurred as a result of these notice(s) being placed in his file, and we therefore do not believe such placement infringes a liberty interest.

The contrary conclusion, that a state law regarding employment practices affords a liberty interest in reputation protected by due process to an officer against defamation, irrespective of a connection between the defamation and termination of that officer, would be quite troublesome in light of Supreme Court and Second Circuit case law. As discussed above, the Supreme Court has expressed its reluctance to constitutionalize state torts, *see Paul, supra;* and the Second Circuit has manifested a clear intention to limit due process claims by employees alleging that they have been defamed to situations in which the defamation took place in the context of termination. *See, e.g., Donato, Martz, supra.*

 Verri's fourteenth claim also alleges that the placement of deficiency notices in his file was a retaliatory act that violated his right to free speech guaranteed by the First Amendment. Having held, *supra,* that his diaries did not address matters of public concern, this claim must also fail. Thus, defendants are entitled to summary judgment on the First Amendment portion of Verri's fourteenth claim.[19]

---

19. Even if the diaries were to be considered a matter of public concern, like many of Verri's other First Amendment allegations, there is a paucity of evidence that the complained of action ever occurred. As discussed above, there is only one deficiency notice in the record that was issued after Nanna gained possession of the diary, and he denies that it or any other notices were ever placed in Verri's personnel file. Moreover, at least one circuit has taken *Paul*'s logic a step further and held that a plaintiff cannot avoid *Paul*'s stricture that "damage to reputation is not actionable under § 1983 unless it is accompanied by 'some more tangible interests'" by alleging that the defamation occurred in retaliation for exercise of First Amendment rights. *Gini v. Las Vegas Metro. Police Dept.,* 40 F.3d 1041, 1045 (9th Cir.1994), (citing *Patton v. County of Kings,* 857 F.2d 1379, 1381 (9th Cir.1988), (quoting *Paul,* 424 U.S. at 701, 96 S.Ct. at 1160–1161)).

Thus, because Verri has failed to allege the falsity of any notices placed in his file, and because we conclude that the placement of deficiency notices in Officer Verri's file, without more, would not violate § 5711–q of the Unconsolidated Laws of New York and would not implicate a liberty interest that entitles him the due process protection of a pre-deprivation hearing under either federal or New York law, we grant summary judgment to defendants on the due process portion of Verri's fourteenth claim. In addition, because Verri's diaries do not address a matter of public concern, we grant defendants' motion for summary judgment on the First Amendment portion of claim fourteen as well.

## IV. Verri's First Amendment Right to Petition the Government

Verri's fifth and sixth claims allege that written and unwritten limitations on the ability of Elmsford Police Officers to communicate with the Village Legislative Board violate his First Amendment rights of free speech and to petition the government. Verri's fifth claim alleges that there "exists within the Elmsford Police Department an unwritten policy, custom and/or practice, imposed by Nanna, by reason of which police officers are forbidden under any circumstances from communicating with any of the elected members of the Village's legislative board." His sixth claim alleges that Elmsford Police Department Rule 16.4.0 is unconstitutional. Rule 16.4.0 provides:

> No member of the Department, with the exception of the Chief of Police, will discuss the need for, possibility of, or make a request for a promotional examination with any member of the Village Board.

We address both of these claims below.

■■■ "The First Amendment right to petition the government for a redress of grievances, which is 'an assurance of a particular freedom of expression' is 'generally subject to the same constitutional analysis' as the right to free speech." *White Plains Towing Corp. v. Patterson*, 991 F.2d 1049, 1059 (2d Cir.), *cert. denied*, 510 U.S. 865, 114 S.Ct. 185, 126 L.Ed.2d 144 (1993) (citations omitted). The Supreme Court has recently outlined the applicable test for determining the constitutionality under the First Amendment of prospective government restrictions on employee speech. *Harman v. City of New York*, 945 F.Supp. 750, 757–758 (S.D.N.Y.1996), (citing *U.S. v. National Treasury Employees Union*, 513 U.S. 454, 115 S.Ct. 1003, 130 L.Ed.2d 964 (1995) ("*NTEU*") (holding restrictions on government employees acceptance of honoraria unconstitutional)). In *NTEU*, the court adopted a modified version of the *Pickering* analysis discussed above, thus rejecting the prior restraint line of cases Verri seeks to rely upon here. *See Harman*, 945 F.Supp. at 759. After noting that consistent with *Pickering*, in the context of prospective restrictions on employee speech the employer must balance the interests of the employee in speaking on matters of public concern against the employer's interest in regulation of that speech, it warned, however, that:

> [U]nlike an adverse action taken in response to actual speech, this ban chills potential speech before it happens.... For these reasons the Government's burden is greater with respect to this statutory restriction on expression than with respect to an isolated disciplinary action.

*NTEU*, 513 U.S. at 468–470, 115 S.Ct. at 1014; *Harman*, 945 F.Supp. at 758. The *NTEU* court then formulated the government's burden in justifying regulations of the future speech of its employees as follows:

> The Government must show that the interests of both potential audiences and a vast group of present and future employees in a broad range of present and future expression are outweighed by that expression's "necessary impact on the actual operation" of the Government.

*Id.,* (quoting *Pickering*, 391 U.S. at 571, 88 S.Ct. at 1736). Therefore, Verri must demonstrate that the speech limited by the policies implicated matters of public concern, and that his interest in speaking outweighed the government's legitimate interest in regulating the speech.

■■■ Under this analysis, Verri's sixth claim, regarding the written policy forbidding police officers from discussing the need for a promotional examination, fails because the

policy addresses matters strictly of personal concern—the desire of individual police officers to be promoted. *See, e.g., Connick,* 461 U.S. at 147–149, 103 S.Ct. at 1690–1691; *McEvoy,* 882 F.2d at 466; *Cf. Day v. South Park Indep. School Dist.,* 768 F.2d 696, 701 (5th Cir.1985). Even if the need for a promotional exam could arguably be considered a matter of public concern, the Elmsford Police Department's interest in the efficient functioning of the department, in particular in the utilization of the chain of command, would likely outweigh the weak interest an individual officer would have in directly petitioning the Board in this limited respect, even under the heightened *NTEU* standard. *See Kelley,* 425 U.S. at 245–246, 96 S.Ct. at 1444–1445 (relying by analogy on *Pickering,* county's choice of organizational policy that gave weight to "overall need for discipline, esprit de corps, and uniformity" justified conclusion that police policy limiting hair length does not violate Fourteenth Amendment), *and cases such as Crain, O'Connor, Busby* and *Policemen's Benev. Ass'n, discussed at page 795, supra; but see Bowen v. Watkins,* 669 F.2d 979 (5th Cir.1982) (police officer's request to City Council for hearing after not being selected for promotion was protected). Thus, we grant defendants' motion for summary judgment on Verri's sixth claim.

However, Verri's fifth claim, regarding the unwritten policy of forbidding *all* contact with the Board, if proven at trial, could conceivably restrict speech on matters of public concern. While we reject Verri's broad allegation that *all* communication is forbidden, Verri has presented sufficient evidence, in the form of testimony of fellow Elmsford Police Officers, to raise a genuine issue of fact as to whether there exists a policy preventing officers from discussing any *police business* directly with the Board. (*See* Woehrle Trans. at 30 (believes police are not allowed to discuss "department business" with the Village Board); Fanelli Trans. at 21–22; Weiss Trans. at 10–11.)

 Although the alleged policy on its face might unduly burden speech on a matter of public concern, Verri has completely failed to allege, let alone raise a genuine issue of material fact as to whether he has ever been

or will ever be injured by the policy restriction, thus his claim is not ripe for adjudication. *Bordell v. General Elec. Co.,* 922 F.2d 1057, 1060 (2d Cir.1991) (employee lacked standing to bring First Amendment challenge to confidentiality policy because he demonstrated no past injury and no immediate threat of future injury). A dispute is ripe for adjudication when there is "a real, substantial controversy between parties having adverse legal interests, a dispute definite and concrete, not hypothetical or abstract." *Motor Vehicle Mfrs. v. DEC,* 79 F.3d 1298, 1305 (2d Cir.1996) (the doctrine prevents adjudicating disputes that may never arise) (citing, inter alia, *Babbitt v. United Farm Workers Nat'l Union,* 442 U.S. 289, 298, 99 S.Ct. 2301, 2309–2309, 60 L.Ed.2d 895 (1979); *Lake Carriers' Ass'n v. MacMullan,* 406 U.S. 498, 508, 92 S.Ct. 1749, 1756, 32 L.Ed.2d 257 (1972) (justiciable controversy exists where "compliance is coerced by the threat of enforcement, and the controversy is both immediate and real")); *Bordell,* 922 F.2d at 1060. "As a general matter, to establish standing to challenge an allegedly unconstitutional policy, a plaintiff must submit to the challenged policy." *Jackson–Bey v. Hanslmaier,* 115 F.3d 1091, 1095–1096 (2d Cir.1997) (plaintiff inmate challenging prison regulation that required inmates to register religion before being accommodated had no standing because he failed to register). This threshold requirement for standing maybe excused only where a plaintiff makes a substantial showing that application for the benefit would have been futile. An unsupported claim of futility is not sufficient. *Id.* at 1096–1097 (citations omitted).

Here, where the contours of the alleged policy are so vague, (for example, we have no indication of the consequences of violating the alleged "policy"), it is not at all clear that had Verri attempted to violate the policy he would have suffered any adverse consequences. In fact, Verri testified at his deposition that he often talked to two Board members about department business on a "friendly basis," as did other officers, and that neither he, nor anyone else he knew of was ever disciplined for such speech. (Verri Trans. at 475–480, 494–499.) When asked what consequences he suffered as a result of his speech, he stated that he "could not give

specifics other than myself," and that his only complaint was that he believed he was not given career advancement such as training, overtime or various promotions because his conversations were common knowledge. (*Id.* at 494–499.) These types of vague accusations are not sufficient to raise a genuine issue of material fact as to immediate harm. His failure to point with any specificity to harm he or anyone else suffered, or to any restraint on speech he desired to make, as a result of this alleged unwritten policy, establishes that his claim is not the type of real or substantial controversy ripe for adjudication.

 Even if we were to presume harm, Verri's failure to allege specific damage precludes him from receiving anything more than nominal damages, since there is a broad prohibition against awarding compensatory damages in § 1983 cases based solely upon the "abstract value" of a constitutional right. *Memphis Community School District v. Stachura*, 477 U.S. 299, 308, 106 S.Ct. 2537, 2543, 91 L.Ed.2d 249 (1986); *cf., Gibeau v. Nellis*, 18 F.3d 107, 110 (2d Cir.1994).

 In addition to his general prayer for damages, Verri has demanded that this court enjoin the departmental custom "forbidding police officers from communicating with their duly elected officials." He has failed to meet the standard for injunctive relief however, which requires a showing of irreparable harm. *Levin v. Harleston*, 966 F.2d 85, 90 (2d Cir.1992) ("allegations of a subjective 'chill' on first amendment speech are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm"). Real and immediate, not remote harm, is what must be demonstrated. *Id.* (where no investigation or disciplinary proceedings were yet undertaken, threat of discipline is not sufficient to warrant injunction). In *Levin*, however, the court focused on the plaintiff's request for "such other and further relief as the Court may deem just" to award the plaintiff a declaratory judgment, which does not require a showing of irreparable harm. Although Verri has made a similar broad request, there must be an actual controversy to justify a declaratory judgment. 28 U.S.C.A. § 2201; 10A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2757 (2d Ed.1983)

("WRIGHT AND MILLER"). An allegation of a chilling effect on First Amendment freedoms is not sufficient to create a justiciable controversy in the absence of a concrete showing of a present objective harm or the threat of some specific future harm. 10A WRIGHT AND MILLER § 2757 n. 25, (citing *Laird v. Tatum*, 408 U.S. 1, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972)). Verri has not met this burden.

Thus, because Verri has failed to allege any concrete, immediate harm that he or anyone else suffered or will suffer as a result of Elmsford's alleged unwritten policy, his claim is not ripe and we grant defendants' motion for summary judgment on Verri's fifth claim.

## V. *Defendant Elmsford's Motion for Summary Judgment on Municipal Liability*

Because we have granted summary judgment to defendant Nanna on all of Verri's constitutional claims, we also grant defendant Elmsford's motion for summary judgment on the ground that it is not liable as a municipality under § 1983 for Nanna's actions. Elmsford cannot be held derivatively liable where there has been no constitutional violation.

## CONCLUSION

Because Verri's diary does not address a matter of public concern, and because he has not produced evidence sufficient to raise a genuine issue of material fact that it was a substantial or motivating factor in any adverse employment decision taken against him, we grant defendants' motion for summary judgment on Verri's third claim for violation of his First Amendment right to free speech. Next, because Verri was not entitled to a pre-deprivation hearing or to have his diary immediately returned, and we conclude that his due process rights were not violated by Nanna's three month retention of the book, we grant Nanna's retention of the diary deprived him of property without due process. Third, since Verri has no cognizable liberty interest in not having deficiency notices placed in his file, in the absence of termination or other formal disciplinary action, we grant defendants' motion for summary judgment on Verri's fourteenth claim for deprivation of liberty without due process. Fourth, because Elmsford's written

policy forbidding police officers from discussing the need for a promotional exam with the Board does not amount to a matter of public concern, nor does an officer's interest in discussing promotional exams outweigh the Police Department's interest in the efficient functioning of the department under *Pickering* and *NTEU,* we grant defendants' motion for summary judgment on Verri's sixth claim. Fifth, because Verri has failed to make a concrete showing of any harm that he or anyone else has suffered or will suffer as a result of the Police Department's alleged unwritten policy preventing police officers from discussing police business with the Board, we grant defendants' motion for summary judgment on Verri's fifth claim. Lastly, because Verri has failed to state any valid claims under § 1983 against Nanna and thus has failed to state any derivative claims against Elmsford, we grant Elmsford's motion for summary judgment on the issue of municipal liability under § 1983. Since there are no remaining federal claims in this action, we decline to exercise our supplemental jurisdiction over Verri's state claims under 28 U.S.C. § 1367, and dismiss those claims without prejudice. The complaint is thus dismissed in its entirety.

SO ORDERED.